# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                              )
UNITED STATES OF AMERICA                      )
                                              )     Crim. No. 06-406-FSH
            v.                                )
                                              )     **ORAL ARGUMENT**
FREDERICK S. SCHIFF and RICHARD               )     **REQUESTED**
J. LANE                                       )
                                              )
_____)


## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION
## TO DISCOVER GRAND JURY MATERIALS

David M. Zornow
Lawrence S. Spiegel
Steven R. Glaser
**Skadden, Arps, Slate**
  **Meagher & Flom LLP**
Four Times Square
New York, New York 10036
(212) 735-3000
**Attorneys for Frederick S. Schiff**

Richard M. Strassberg
Samantha L. Schreiber
**Goodwin Procter LLP**
599 Lexington Avenue
New York, New York 10022
(212) 813-8800

and

Roberto M. Braceras
James O. Fleckner
**Goodwin Procter LLP**
Exchange Place
Boston, MA 02109
(617) 570-1000
**Attorneys for Richard J. Lane**

July 28, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 3

ARGUMENT ............................................................................................................... 9

I.     DISCOVERY OF THE GRAND JURY PROCEEDINGS IS NECESSARY
      TO DETERMINE WHETHER THE SECOND INDICTMENT SHOULD
      BE DISMISSED FOR GRAND JURY ABUSE ....................................................... 10

        A.     At Minimum, Grounds May Exist To Dismiss The Second
             Indictment ........................................................................................... 10

        B.     The Grand Jury's Conflict Of Interest May Warrant Dismissal
             Of The Second Indictment With Prejudice ..................................... 11

        C.     Discovery Also Is Necessary To Determine Whether The
             Government's Presentation To The Second Grand Jury Was
             Improperly Based On Summary Testimony..................................... 16

        D.     Reasonable Grounds Exist To Believe That Improper Legal
             Instructions Were Given To The Grand Juries That Would Require
             Dismissal ............................................................................................. 19

        E.     Discovery Is Needed To Determine The Adequacy Of The
             *Voir Dire* ........................................................................................... 22

II.    THERE IS NO COUNTERVAILING REASON TO CONTINUE TO
      SHROUD THE GRAND JURY PROCEEDINGS IN SECRECY ........................... 23

CONCLUSION ............................................................................................................ 26

LIBA/1719226.1

# TABLE OF AUTHORITIES

## Cases

Ballard v. United States,
329 U.S. 187 (1946) ........................................................................................................ 12

Branzburg v. Hayes,
408 U.S. 665 (1972) .................................................................................................. 14, 17

Dennis v. United States,
384 U.S. 855 (1966) .................................................................................................. 15, 24

Douglas Oil Co. v. Petrol Stops Nw.,
441 U.S. 211 (1979) ........................................................................................................ 23

Greebel v. FTP Software, Inc.,
194 F.3d 185 (1st Cir. 1999) .......................................................................................... 21

In re Bristol-Myers Squibb Securities Litigation,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................................................................. 5

In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410 (3d Cir. 1997) ......................................................................................... 20

In re Cytyc Corp. Sec. Litig.,
Fed. Sec. Rptr. 93, 225 (D. Mass. March 1, 2005) ........................................................ 21

In re Grand Jury Proceedings (Johanson),
632 F.2d 1033 (3d Cir. 1980) ......................................................................................... 14

In re J. P. Linahan,
138 F.2d 650 (2d Cir. 1938) ........................................................................................... 12

In re Murchison,
349 U.S. 133 (1955) ........................................................................................................ 12

In re Sofamor Danek Group, Inc.,
123 F.3d 394 (6th Cir. 1997) .......................................................................................... 20

In re Trex Co., Inc. Sec. Litig.,
212 F. Supp. 2d 596 (W.D. Va. 2002) ............................................................................ 21

Pub. Util. Comm'n v. Pollak,
343 U.S. 451 (1952) ........................................................................................................ 12

Tumey v. Ohio,
273 U.S. 510 (1927) ............................................................................................. 12

United States v. Abounnajah,
No. CR-91-00146(CBA), 1991 WL 42895 (E.D.N.Y. Mar. 1991)............................................ 21

United States v. Budzanoski,
462 F.2d 443 (3d Cir. 1972).................................................................................... 11

United States v. Carcaise,
442 F. Supp. 1209 (M.D. Fla. 1978)....................................................................16, 17, 18

United States v. Cote,
929 F. Supp. 364 (D. Ore. 1996) .............................................................................. 19

United States v. Fowlie,
24 F.3d 1059 (9th Cir. 1994)................................................................................... 25

United States v. Gibson,
480 F. Supp. 339 (S.D. Ohio 1979) ........................................................................... 22

United States v. Mahoney,
495 F. Supp. 1270 (E.D. Pa. 1980)............................................... 10, 11, 17, 18, 19, 23

United States v. Maine Lobster Co.,
160 F. Supp. 122 (D. Me. 1957)................................................................................ 22

United States v. Obiuwevbi,
No. 89-CR-1062, 1990 WL 36733 (N.D. Ill. Mar. 2, 1990)................................................. 10, 23

United States v. Peralta,
763 F. Supp. 14 (S.D.N.Y. 1991) .......................................................................... 19, 20

United States v. R. Enter. Inc.,
498 U.S. 292 (1991) ............................................................................................ 14

United States v. Rose,
215 F.2d 617 (3d Cir. 1954).................................................................................... 23

United States v. Serubo,
604 F.2d 807 (3d Cir. 1979)............................................................................10, 12, 15, 16

Vasquez v. Hillery,
474 U.S. 254 (1986) ............................................................................................ 12

ZVI Trading Corp. Employees' Money Purchase Pension
Plan & Trust v. Ross, (In re Time Warner Sec. Litig.),
9 F3d 259 (2d Cir. 1993)................................................................................................ 20

**Rules, Statutes, and Regulations**

Fifth Amendment, U.S. Constitution..................................................................1, 11, 13

18 U.S.C. §3500 .......................................................................................................... 24

28 U.S.C. §1866(c)(2)................................................................................................. 22

Fed. R. Crim. P. 6(e)(2)(E) ......................................................................................... 25

Fed. R. Crim. P. 6(e)(3)(B) ..................................................................................... 2, 25

Fed. R. Crim. P. 6(e)(3)(E)(i)................................................................................... 2, 25

Fed. R. Crim. P. 6(e)(3)(E)(ii) ............................................................................. 1, 9, 10

Fed. R. Crim. P. 6(h)................................................................................................... 22

**Secondary Sources**

Christopher J. Christie and Robert M. Hanna, A Push Down The Road
Of Good Corporate Citizenship: The Deferred Prosecution Agreement
Between The U.S. Attorney For The District of New Jersey And Bristol-
Meyers Squibb Co., 43 Am. Crim. L. Rev. 1043 (Summer 2006)..............................6, 20, 21, 24

Donald C. Langevoort, Investment Analysts and the Law of Insider
Trading, 76 Va. L. Rev. 1023 (1990) ......................................................................... 20

## <u>INTRODUCTION</u>

In an unprecedented violation of the Fifth Amendment right to indictment by a grand jury, defendants Frederick S. Schiff and Richard J. Lane were indicted by a <u>conflicted grand jury</u> — a grand jury that had a member with a financial motive to manipulate the investigation and its outcome.  The government itself acknowledged the prejudice caused by the grand jury's conflict of interest by dismissing the initial indictment naming Mr. Schiff and Mr. Lane.  But the government's dismissal is a half-measure that solely addresses the grand jury's vote on probable cause; the government's remedy ignores the grand jury's equally critical role in developing and investigating the facts.  The government cannot simply re-indict the same defendants on the same charges based on the same "evidence" developed by the corrupted grand jury.  The taint from the first grand jury, which sat for approximately <u>twenty months</u>, cannot be undone by the window-dressing of a second grand jury that may have taken as little as <u>one day</u> to return a virtually identical indictment based on the record developed by the corrupted first grand jury.

To determine the extent and breadth of the taint caused by the conflicted grand jury, Defendants are entitled to discovery as to both grand juries under Fed. R. Crim. P. 6(e)(3)(E)(ii).  Such discovery may well support the dismissal of the second indictment, which was filed on May 25, 2006 ("Second Indictment").  Discovery also is required because the Second Indictment: (a) appears to be the product of insufficient summary testimony, notwithstanding the availability of percipient witnesses; (b) may well have been the result of erroneous legal instructions provided by the U.S. Attorney; and (c) may well have been returned by a grand jury ("Second Grand Jury") that was not sufficiently vetted during *voir dire,* particularly in light of the U.S. Attorney's inflammatory and prejudicial public remarks following the return of the first indictment on June 14, 2005 ("First Indictment").

Specifically, Defendants request the following:

- The identity of the grand jurors who returned the two indictments, as well as the dates the grand juries were in session and attendance sheets for such grand juries;

- All transcripts of proceedings before the grand juries that returned the First and Second Indictments, including testimony of witnesses, questions by prosecutors and grand jurors, and any legal instructions provided by the prosecutor;

- FBI FD-302s or other similar government reports reflecting information concerning the grand jury that returned the First Indictment ("First Grand Jury"), including information as to Jason Smith's conduct on the First Grand Jury and his insider trading scheme;

- All transcripts of the *voir dire* interrogations of prospective Second Grand Jury members, as well as all questionnaires, if any, presented to, and answers received from, prospective members of the Second Grand Jury; and

- All government certifications required by Fed. R. Crim. P. 6(e)(3)(B) attendant to disclosure of materials from the First Grand Jury; all Rule 6(e)(3)(E)(i) petitions to disclose, including any transcripts of hearings on such motions and rulings thereupon; and all documents reflecting dissemination of U.S. Attorney and Securities and Exchange Commission ("SEC") press releases concerning the grand juries to media outlets.

Importantly, at this stage of the litigation, there are <u>no</u> countervailing factors weighing against disclosure of the grand jury proceedings.  To the contrary, through the filing of public charging instruments and through myriad statements to the press, the government itself has already disclosed significant aspects of the grand jury proceedings, including: the dates the grand jury met; the dates witnesses appeared; certain of the instructions given to the grand jurors; the oaths taken by the grand jurors; and the conduct of grand jurors while the grand jury was meeting.  Much of the material requested by Defendants will be disclosed in any event, either as Jencks Act material or during discovery in the criminal and civil proceedings against Jason Smith.  Thus, it is not a question of whether the material will be disclosed, but when.  On these facts, the government's refusal to provide Defendants discovery of the grand jury proceedings,

2

by relying on conventional principles of secrecy — particularly where there is no likelihood of violence or perjury — is misplaced and unfair.

## **FACTS**

The facts of this case have been described in Defendants' motions arguing that the Second Indictment should be dismissed in its entirety for failure adequately to charge any crime. See Memorandum of Law in Support of Defendant Frederick S. Schiff's Omnibus Motion to Dismiss the Indictment or in the Alternative to Strike Certain Portions of the Indictment and for a Separate Trial, July 21, 2006, Docket No. 12 (hereinafter "Schiff Omnibus Brief") and Memorandum in Support of Defendant Richard J. Lane's Motion to Dismiss the Indictment, or, in the Alternative, to Sever and Strike Surplusage, July 21, 2006, Docket No. 19.  In summary, the Second Indictment alleges that Defendants were part of a conspiracy to inflate the reported sales and earnings of Bristol-Myers Squibb Co. ("Bristol-Myers" or the "Company") by discounting sales to its wholesaler customers, failing to disclose this practice, and engaging in accounting irregularities.  More specifically, the Second Indictment alleges that Bristol-Myers announced in 1994 the first of two aggressive, long-term goals to increase sales, earnings, and earnings-per-share over time.  (Second Indictment at ¶13.)  In furtherance of these corporate goals, Bristol-Myers and Defendants allegedly sold product to their wholesaler customers in 2000 and 2001 in excess of what the government characterizes as "normal" wholesaler levels. The Second Indictment alleges that the Bristol-Myers shareholders were injured when Defendants' actions were disclosed to the investing public by the Company on or about April 1, 2002.  (Id. at ¶55.)

According to the government, an investigation was opened by the SEC following the Company's April 2002 announcement.  (Decl. of Joshua Drew at ¶3, SEC v. Schiff and Lane,

Civil No. 05-4132 (FSH) (D.N.J. Oct. 31, 2005); App Ex. B.[1])  The U.S. Attorney's Office,
along with the FBI and U.S. Postal Inspection Service, began their investigation in October 2002.
(Id. at ¶4.)

One year later, on or about October 21, 2003, a federal grand jury was empanelled by this
Court.  (Complaint at ¶3, United States v. Smith, No. 2:06-mj-03556-MF (D.N.J. May 10, 2006)
(hereinafter "D.N.J. Compl."); App. Ex. C.)  The grand jury investigated possible violations of
the securities laws at Bristol-Myers arising from Bristol-Myers's sales and accounting practices.
(Id. at ¶4.)  Jason Smith, a postal worker from Jersey City, was initially selected as an alternate to
the grand jury, but by December 2003 he was made a regular member.  (Id. at ¶6; Proposed
Third Am. Compl. at ¶23, SEC v. Anticevic, No. 05-civ-6991 (KMW) (S.D.N.Y. undated)
(hereinafter "SEC Compl."); App. Ex. D.)

While Smith and the other members of the First Grand Jury were investigating Bristol-
Myers, Smith entered into an insider trading scheme with a longstanding friend whom he had
known since high school, David Pajcin, then an analyst at Goldman, Sachs & Co.  (SEC Compl.
at ¶4.)  Smith discussed with Pajcin the fact that Smith was participating in a grand jury
investigation of whether any instances of securities fraud or accounting improprieties had been
committed at Bristol-Myers.  (D.N.J. Compl. at  ¶¶4, 13; SEC Compl. at ¶4.)  Smith, Pajcin, and
another Goldman, Sachs & Co. employee, Eugene Plotkin, seized upon Smith's jury service and
devised a scheme whereby Smith would "secretively" [sic] convey information about the
direction of the grand jury proceedings to Pajcin and Plotkin, with the purpose of having them
and others trade on the information.  (Compl. at ¶19, United States v. Smith, No. 06-mj-0658
(AJP) (S.D.N.Y. May 10, 2006) (hereinafter "S.D.N.Y. Compl."); App. Ex. E; D.N.J. Compl. at

---

[1]     "App. Ex. ____" references Defendants' attached Appendix of Exhibits.

¶14.)  Smith would share in any profits made as a result of the trading based on his information. (S.D.N.Y. Compl. at ¶20; D.N.J. Compl. at ¶14.)  As planned, in March and June 2005, Pajcin and several of his associates made numerous trades based on the confidential grand jury information Smith provided to them.  (S.D.N.Y. Compl. at ¶¶16, 17, 19.)  Thus, Smith was to profit from the outcome of a grand jury investigation in which he participated.

The First Grand Jury continued to hear testimony from live witnesses into 2005.  A senior Bristol-Myers officer who ultimately was not indicted testified "multiple" times in March 2005. (D.N.J. Compl. at ¶15.)  Smith described the testimony to his accomplices on Wall Street. (S.D.N.Y. Compl. at ¶21.)  Although the grand jury had been empanelled for eighteen months and had been hearing testimony from witnesses for at least fourteen months, it still had not concluded its investigation or reached a conclusion as to probable cause sufficient to return an indictment.  Thus, in April 2005, the grand jury's term was extended for six additional months, until in or about October 2005.  (Id. at ¶3.)

On June 14, 2005, almost twenty months after it was empanelled, the Grand Jury returned under seal the First Indictment, which charged both defendants with securities fraud and conspiracy to commit securities fraud.[2]  The First Indictment was unsealed the following day, to coincide with a press conference held by the U.S. Attorney for the District of New Jersey.  As described more fully in the Schiff Omnibus Brief, during that press conference, the U.S. Attorney violated numerous ethical rules and regulations by publicly attacking Mr. Schiff and Mr. Lane and offering his personal opinion of their guilt.

---

[2]   Despite the length of the First Grand Jury's investigation, an indictment was far from certain, particularly after the dismissal of the civil claims of securities fraud in In re Bristol Myers Squibb Securities Litigation, 312 F. Supp. 2d 549 (S.D.N.Y. 2004), attached hereto for the Court's convenience at App. Ex. A, which was predicated largely on the same facts and theories of fraud as this criminal case.  The prejudice caused by the conflicted First Grand Jury is all the more evident given the razor-thin distinctions that the grand juries apparently were making.

At the same time, the government entered into a heavily publicized (and now much-criticized) deferred prosecution agreement with Bristol-Myers ("Deferred Prosecution Agreement"), attached at App. Ex. F.  (See, e.g., George Jordan, Bristol Charged with Investor Scheme, The Star Ledger, June 16, 2005, p. 1; App. Ex. G (hereinafter "Star Ledger Article") (containing criticism of agreement); compare Christopher J. Christie and Robert M. Hanna, A Push Down the Road of Good Corporate Citizenship: The Deferred Prosecution Agreement between the U.S. Attorney for the District of New Jersey and Bristol-Myers Squibb Co., 43 Am. Crim. L. Rev. 1043 (Summer 2006) (hereinafter "Christie & Hanna"); App. Ex. H (defending agreement).)  The agreement included such unusual provisions as a requirement that the Company endow a chair of ethics at Seton Hall Law School (the U.S. Attorney's alma mater); that Bristol-Myers's then-Chairman and CEO Peter Dolan relinquish his position as chairman; and that the U.S. Attorney be allowed input into the selection of a new Bristol-Myers board member.  (See Star Ledger Article; Deferred Prosecution Agreement at ¶¶8, 9, 20.)  Part of the agreement also required the Company to assent to any request by the government to disclose confidential grand jury material.  (Deferred Prosecution Agreement at ¶31(c).)[3]

After the return of the First Indictment and the execution of the Deferred Prosecution Agreement, Smith's insider trading schemes unraveled.  Smith's co-conspirator, Pajcin, cooperated with the government and described to government agents the disclosures he received

---

[3]   In a recent article (which the U.S. Attorney published notwithstanding the pending case) the U.S. Attorney defended the Deferred Prosecution Agreement.  Notably, the U.S. Attorney and the Assistant supervising the presentation of evidence to the First Grand Jury made serious misstatements of law that appear to have been the underpinning of their theory of prosecution.  Specifically, the government attorneys incorrectly stated that the securities laws require "disclosing all material facts" and that "channel stuffing . . . constitutes securities fraud."  Christie & Hanna, 43 Am. Crim. L. Rev. at 1048, 1056.

from Smith about the First Grand Jury proceedings.  (D.N.J. Compl. at ¶10.)[4]  Ultimately, on

May 10, 2006, the government filed criminal complaints against Smith in both the District of

New Jersey and the Southern District of New York.  The New Jersey complaint alleges criminal

contempt of court arising from improper disclosure of grand jury information.  (D.N.J. Compl. at

¶24.)  The New York complaint alleges criminal securities fraud and conspiracy to commit

insider trading.  (S.D.N.Y. Compl. at ¶¶3-4.)

Importantly, in the publicly-filed complaints, the government made extensive disclosures

about the grand jury process.  Among other things, the government identified Smith as a grand

juror, discussed details of Smith's conduct while empanelled as a grand juror, disclosed the type

of investigation the grand jury was conducting, the dates certain individuals testified before the

grand jury, the charge the grand jury received upon empanelment, and instructions given by the

prosecutor during the grand jury's investigation.  (D.N.J. Compl. at ¶¶3, 4, 6, 7, 15, 17, 18;

S.D.N.Y. Compl. at ¶¶13-14, 16-18, 21, 23-24, 26, 28.)  Both the U.S. Attorney for the District

of New Jersey and the U.S. Attorney for the Southern District of New York issued press releases

on May 11, 2005, announcing the charges against Smith; they also placed the announcements on

their public web-sites.[5]  The press release issued by the U.S. Attorney for the Southern District of

New York recites instructions given by prosecutors to the First Grand Jury before it had even

returned the First Indictment.  (See, e.g., Michael De La Merced, Arrest of Grand Juror is Latest

Twist in Insider Trading Case, New York Times, May 12, 2006, p. C1; App. Ex. I (hereinafter

"New York Times Article").)

---

[4]   Such disclosures and other information concerning Smith's grand jury misconduct would
      have been recorded in some detail in FBI FD-302s and other government reports, which
      Defendants request as part of this motion.

[5]   See http://www.usdoj.gov/usao/nj/press/files/smit0511_r.htm (last visited July 27, 2006);
      App. Ex. J; and http://www.usdoj.gov/usao/nys/Press%20Releases/May%2006/Smith,%20
      Jason%20Complaint%20PR.pdf (last visited July 27, 2006); App. Ex. K.

In addition to the complaints brought by federal prosecutors in New York and New Jersey relating to Smith's activities on the grand jury, the SEC also brought an action against Smith relating to his grand jury conduct. Like the prosecutors, the SEC issued a press release and posted a report on its public web-site discussing the charges and conduct of the First Grand Jury.[6] Moreover, like the criminal complaints, the civil complaint publicly disclosed the substance of the grand jury proceedings. (See, e.g., SEC Compl. at ¶¶65, 68.) The Northeast Regional Director of the SEC, Mark Schonfeld, stated that Smith was the first person ever charged in an insider trading case with "leaking grand jury testimony." (New York Times Article.) Another SEC official stated: "The grand jury lies at the heart of the judicial process, and to pervert that is particularly egregious." (Brooke A. Masters, Fourth Suspect Charged in Massive Insider Trading Ring; Member of Grand Jury Leaked Information about Bristol-Myers Squibb, Complaints Say, The Washington Post, May 12, 2006, p. D02; App. Ex. M (hereinafter "Washington Post Article").)

Two days after the filing of the criminal and civil complaints, counsel for Messrs. Schiff and Lane requested discovery of certain grand jury materials from the government to understand more fully the harm caused by this "egregious" conduct and to explore possible remedies. The government declined to provide any discovery whatsoever.

Despite the obvious perversion of the grand jury process, on May 12, 2006, a spokesperson for the U.S. Attorney for the District of New Jersey declared that the charges against Grand Juror Smith would not affect the case against Messrs. Schiff and Lane. (John P. Martin, Mailman Accused of Grand Jury Leaks for Insider Trading, The Star Ledger, May 12, 2006; App. Ex. N). Apparently recognizing its error, the government abruptly reversed course.

---

[6] See http://www.sec.gov/litigation/litreleases/2006/lr19696.htm (last visited July 27, 2006); App. Ex. L.

Only ten business days later, on May 24, 2006, this Court granted the government's motion to dismiss the First Indictment. The very next day, on May 25, 2006, the Second Indictment was filed.

The Second Indictment corresponds substantially to the First Indictment: it names as defendants only Messrs. Schiff and Lane; it contains the same two counts for securities fraud and conspiracy to commit securities fraud; it contains a recitation of the same overt acts over the same period of time; and it alleges the same purpose of the conspiracy.[7] But this time, rather than collecting and considering evidence over a twenty-month period, the Second Indictment was secured by only the most summary process: a grand jury "investigation" of perhaps as little as one day.

During a hearing on June 2, 2006, the Court invited the parties to reach a compromise on the issues surrounding these exceptional circumstances of grand jury corruption. The government refused again to provide any discovery to Defendants, leaving Defendants no alternative than to file this motion seeking discovery to determine whether grounds exist for dismissal based on grand jury misconduct.

## **ARGUMENT**

Fed. R. Crim. P. 6(e)(3)(E)(ii) expressly allows for discovery of grand jury material where defendants show that a ground relating to the grand jury <u>may</u> exist to dismiss the indictment. Here, multiple grounds may exist to dismiss the pending Second Indictment. Indeed, Defendants are entitled to full discovery of the grand jury proceedings to vindicate their

---

[7]     The Second Indictment does, however, make certain changes that appear designed to correct flaws identified by Defendants in a full round of briefing directed to the First Indictment. Notwithstanding these changes, the Second Indictment remains legally infirm and should be dismissed as a substantive matter for its failure to identify a set of facts that constitutes any criminal activity, let alone fraud, as more fully addressed in the separate motions to dismiss.

constitutional rights.  Moreover, there is no countervailing reason to continue to shroud the grand jury proceedings in secrecy, particularly where the grand juries have returned their indictments and the government itself has publicly disclosed significant portions of the proceedings.

**I.      DISCOVERY OF THE GRAND JURY PROCEEDINGS IS NECESSARY TO DETERMINE WHETHER THE SECOND INDICTMENT SHOULD BE DISMISSED FOR GRAND JURY ABUSE**

### A.      At Minimum, Grounds May Exist To Dismiss The Second Indictment

To receive discovery, Defendants need not demonstrate that the Second Indictment must be dismissed.  This Court may grant discovery to a defendant "who shows that a ground <u>may</u> exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).[8]  Numerous courts have granted defendants disclosure of grand jury materials upon a showing that grounds may exist to dismiss the indictment.  <u>See, e.g.</u>, <u>United States v. Serubo</u>, 604 F.2d 807 (3d Cir. 1979) (remanding case to allow defendants to examine undisclosed grand jury transcripts); <u>United States v. Mahoney</u>, 495 F. Supp. 1270 (E.D. Pa. 1980) (ordering disclosure of grand jury transcripts to defendant's attorney); <u>United States v. Obiuwevbi</u>, No. 89-CR-1062, 1990 WL 36733, at *3 (N.D. Ill. Mar. 2, 1990) (same).

Defendants easily meet that standard here.  As set forth more fully below, there are four separate and independent reasons relating to the grand jury that, at minimum, <u>may</u> warrant dismissal in this case:  (a) a fundamental conflict of interest on the part of the First Grand Jury; (b) the improper reliance on summary evidence to obtain the Second Indictment; (c) erroneous legal instructions by the U.S. Attorney; and (d) inadequate *voir dire* to determine the extent of

---

[8]      Fed. R. Crim. P. 6(e)(3)(E)(ii) states, as follows:

(E) The court may authorize disclosure — at a time, in a manner, and subject to any other conditions that it directs — of a grand-jury matter:

(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury; . . . .

the prejudice caused by the U.S. Attorney's inflammatory remarks following the First Indictment.

Even if Grand Juror Smith's extraordinary conduct were the sole issue, however, it would warrant disclosure. The government itself has described Grand Juror Smith's conduct as a "perver[sion]" of the judicial process. (Washington Post Article.) Because of this perversion, the government has filed criminal and civil complaints against Smith and dismissed the First Indictment. Thus, by its own decisions, the government has essentially conceded that there is "a substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury," demonstrating that, at minimum, grounds "may exist" to dismiss the Second Indictment. Mahoney, 495 F. Supp. at 1275 n.5 (quoting United States v. Budzanoski, 462 F.2d 443, 454 (3d Cir. 1972)).[9] Indeed, if there were ever a circumstance in which defendants had a "particularized need" for disclosure of grand jury material, this would be it. See Mahoney, 495 F. Supp. at 1273.

**B.      The Grand Jury's Conflict Of Interest May Warrant Dismissal Of The Second Indictment With Prejudice**

Indictment by grand jury is neither a procedural nicety nor a technicality. Indictment by an impartial grand jury is a fundamental right guaranteed by the Fifth Amendment. Grand Juror Smith's inherent conflict of interest — indeed, Smith was financially motivated to return an indictment — may well have deprived the Defendants of their right to an impartial grand jury, even with respect to the Second Indictment. If this is the case, the Second Indictment would have to be dismissed with prejudice.

---

[9]      The Third Circuit in Budzanoski concluded that the trial court acted within its discretion where defendants had not made the showing required to obtain discovery of grand jury material, but this case stands in sharp contrast. See, e.g., Budzanoski, 462 F.2d at 454 (defendants offered only general allegations or "speculation" that "improprieties may have occurred"). The government's own charges filed against Smith contain the exact types of specific allegations of grand jury misconduct lacking in Budzanoski.

It is well-settled that certain defects in the grand jury process are so grave that they undermine the grand jury's constitutional role and require dismissal of an indictment.  For example, racial discrimination in the selection of grand jurors requires dismissal, see Vasquez v. Hillery, 474 U.S. 254, 260-64 (1986), as does the exclusion of women, see Ballard v. United States, 329 U.S. 187, 196 (1946).  As the Third Circuit has recognized, "the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment."  Serubo, 604 F.2d at 816 (citation omitted) (emphasis added).

These principles apply with equal force when a subject or defendant is judged by someone who has a financial stake in the proceeding.  As long ago as 1927, the Supreme Court held that a conviction could not stand when it was meted out by a local mayor vested with authority to adjudicate whether prohibition laws were violated where the mayor's compensation was augmented by any fines collected for prohibition violations.  See Tumey v. Ohio, 273 U.S. 510, 523 (1927).  Writing for the unanimous Court, Chief Justice Taft held that it "deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."  Id.  In such circumstances, "when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review, and [courts] must presume that the process was impaired."  Vasquez, 474 U.S. at 263.[10]

---

[10]    It is axiomatic that our system of justice requires disinterestedness.  See, e.g., In re Murchison, 349 U.S. 133, 136 (1955) ("no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome"); Pub. Util. Comm'n v. Pollak, 343 U.S. 451, 466-67 (1952) ("the administration of justice should reasonably appear to be disinterested as well as to be so in fact") (Frankfurter, J., addressing recusal); In re J. P. Linahan, 138 F.2d 650, 651-54 (2d Cir. 1938) ("Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness.").

Here, there is no question that Grand Juror Smith had a personal financial incentive to return an indictment against any of Bristol-Myers's present or former officers.  It is equally clear that Grand Juror Smith had a financial incentive to steer the grand jury <u>investigation</u> toward indictment.  As such, Grand Juror Smith was inherently motivated not to adduce evidence tending to exculpate.  Smith is alleged to have had an agreement with Pajcin and others to share in any profits made from short-selling Bristol-Myers stock, which was expected to decline in value if the First Grand Jury charged that a crime occurred.  (<u>See</u> S.D.N.Y. Compl. at ¶¶19, 20; D.N.J. Compl. at ¶14.)  Smith was thus betting on the outcome and had a financial motive to manipulate the investigation.  Indeed, the government itself has admitted that Smith's conflict of interest "pervert[ed]" the grand jury process.  (Washington Post Article.)  Apparently recognizing the irreparable harm that Smith inflicted upon the grand jury process, the government dismissed the First Indictment.

While the government deserves credit for conceding the defect in the First Indictment, the government's remedy did not solve the problem, but rather compounded it.  By hastily presenting a nearly identical indictment to a second grand jury, the government likely grafted the tainted results of the first investigation onto the Second Indictment.  The Fifth Amendment right to indictment by a grand jury is not simply the right to an impartial vote on probable cause.  Equally important is the grand jury's historic role as an investigative body, responsible for seeking information and shaping the development of evidence that would tend to support any finding of probable cause:

> The grand jury occupies a unique role in our criminal justice system.  It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed.  Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.  The function of the grand

13

> jury is to inquire into <u>all</u> information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred.

<u>United States v. R. Enters., Inc.</u>, 498 U.S. 292, 297 (1991) (internal quotations and citations omitted) (emphasis added); <u>see also</u> <u>Branzburg v. Hayes</u>, 408 U.S. 665, 686-687 (1972).

By dismissing the First Indictment and subsequently re-indicting Mr. Schiff and Mr. Lane, the government attempted to obtain a clean vote on probable cause. But the re-indictment does nothing to remedy the prejudice caused during the investigative phase of the tainted grand jury. To the contrary, the lightning-quick re-indictment strongly suggests that the Second Grand Jury relied entirely on the tainted first investigation. The First Grand Jury sat for approximately twenty months and apparently heard from dozens of witnesses. The Second Grand Jury, however, devoted little time to its "investigation." Presumably, the Second Grand Jury was not empanelled on May 12, 2006, when the government announced that the charges against Smith would not affect the case against Messrs. Schiff and Lane. Therefore, the Second Grand Jury sat for two weeks at most. Most likely, the Second Grand Jury sat for only one day following the dismissal of the First Indictment.[11] Under these circumstances, it is difficult to conceive how the Second Grand Jury could have conducted its own investigation of this complex case.

Where, as here, a defendant has a particularized need for grand jury material based on evident misconduct in a prior grand jury, the Third Circuit has held that it is reversible error to

---

[11] It is well-settled that a grand jury cannot continue to investigate charges against indicted individuals. <u>See, e.g.</u>, <u>In re Grand Jury Proceedings (Johanson)</u>, 632 F.2d 1033, 1041 (3d Cir. 1980) ("It is a firmly entrenched rule that once a defendant has been indicted, a prosecutor may not use a grand jury's investigative powers for the purpose of securing additional evidence against the defendant for use in the upcoming trial.") (citing cases). Here, the First Indictment was pending until dismissed on May 24, 2006. The Second Indictment contains the same charges against the same defendants. The Second Grand Jury was not investigating additional charges or other subjects; the government was not seeking a superseding indictment. Thus, it is likely that the Second Grand Jury met only after the First Indictment was dismissed, on May 25, and returned the Second Indictment on the same day.

14

deny such discovery.  See Serubo, 604 F.2d at 818-19 (vacating judgment and remanding case for a new trial, holding that full discovery into the grand jury proceedings had been necessary to determine whether the indictment should have been dismissed).  In Serubo, transcripts of grand jury testimony provided pursuant to defendants' Brady requests showed that the prosecutor engaged in "reprehensible and unacceptable" conduct in questioning witnesses before a first grand jury that nonetheless did not return an indictment.  Id. at 814.  The conduct was so grave as to infringe potentially on defendants' right to "a grand jury unaffected by bias or prejudice."  Id. at 817.

Because the court could not determine without the aid of discovery whether the misconduct that occurred before the first grand jury was evident during the proceedings before the second, it ordered that the government disclose those portions of the second grand jury proceedings that were not previously supplied to defendants.  See Serubo, 604 F.2d at 818-19. Specifically, the Third Circuit ruled that the indictment should be quashed if the improprieties from the first grand jury "infected the proceedings before the second grand jury because transcripts [from the first grand jury] reflecting [the improprieties] were utilized."  Id. at 819. The court also explained that tribunals cannot simply rely on self-serving statements by the government that a grand jury's pre-trial investigation was "taint-free."  Rather, where circumstances show that the taint in the first proceeding was substantial, discovery is required to allow "meaningful judicial determination of taint made upon a fully developed record."  Id. at 813.[12]

---

[12]   See also Dennis v. United States, 384 U.S. 855, 873 (1966) (failure to provide grand jury testimony of witnesses testifying at trial was reversible error, resulting in Court vacating conviction: "the defense, the judge and the [petit] jury should have the assurance that the doors that may lead to truth have been unlocked").

Here, the corruption caused by Grand Juror Smith's bias was even more grave than that at issue in Serubo.  While the prosecutor's conduct in Serubo was a disciplinary matter for the Justice Department, id. at 819, Smith's alleged wrongdoing has prompted the government to file multiple civil and criminal actions against him and to move for dismissal of the First Indictment.

Accordingly, Defendants need discovery of the grand jury proceedings to determine the nature and breadth of the taint caused by the corrupted First Grand Jury throughout its investigation.  If discovery confirms that the Second Indictment is predicated on the First Grand Jury's irreparably tainted investigation, then this Court must dismiss the Second Indictment as well.  Defendants are entitled to a fair and impartial grand jury — a fundamental right inherent in the entire investigatory phase, and not limited merely to a perfunctory vote on probable cause.

**C.**   **Discovery Also Is Necessary To Determine Whether The Government's Presentation To The Second Grand Jury Was Improperly Based On Summary Testimony**

As discussed, the First Grand Jury sat for approximately twenty months and apparently heard from dozens of witnesses, while the Second Grand Jury met for at most two weeks, and more likely only one day, to conduct its supposed "investigation."  In nearly identical circumstances, courts have dismissed indictments, because the grand jury investigation failed to withstand due process scrutiny.

In United States v. Carcaise, 442 F. Supp. 1209 (M.D. Fla. 1978), a first grand jury did not return an indictment.  A second grand jury met in two sessions for a total of six hours and forty-five minutes.  Id. at 1210-11.  In that time, it returned two indictments, one of which charged five defendants in a scheme to defraud.  The indicting grand jury was only given summary testimony, including a summary by a government attorney of 1,160 pages of various deposition testimony taken in civil cases of defendants.  On these facts, the court dismissed the resulting indictment.  It began its analysis by describing the investigatory role required of a grand

jury and the Supreme Court's admonition that a grand jury "must call witnesses [] in the manner best suited to perform its task" because "society's interest is best served by a thorough and extensive investigation." Id. at 1212 (quoting Branzburg, 408 U.S. at 701).  After reviewing for itself the transcripts of the live testimony presented to the grand jurors, as well as the depositions that were summarized in such testimony, the court observed that the "deposition testimony focused far more extensively on the individual activities of each of the defendants" than did the summaries. Id. at 1213.

This defect was critical to the court's analysis because each individual defendant was alleged to have played a specific and particular role in the alleged scheme. Carcaise, 442 F. Supp. at 1212-13.  The court held that, "without some reasonably careful scrutiny of each defendant's conduct, the grand jury could not have fulfilled its obligation to protect citizens against unfounded criminal prosecution and the enormous consequences that are attendant on any criminal prosecution, well-founded or otherwise." Id. at 1213.  The court thus concluded that dismissal was the only appropriate recourse:

> Without a thorough understanding of the deposition testimony, the grand jury could not possibly have performed its tripartite duty to make a careful investigation, to determine probable cause, and to protect citizens against unfounded accusation.  The court, therefore, concludes that the procedure employed by the prosecutors in their presentation of the deposition testimony to the grand jury was so inconsistent with the responsibility of the grand jury as to require a dismissal of the indictment.

Id.; see also Mahoney, 495 F. Supp. at 1276 n.9 (citing Carcaise approvingly, and ordering discovery of grand jury material to determine if such abuse occurred).

As in Carcaise, the Second Grand Jury here may have met for as little as one day.  In such a short time, the Second Grand Jury could not have fulfilled its constitutional role as a "buffer" in assessing the evidence to determine probable cause as to each of the Defendants as to

each of the charges, particularly given: (i) the complex nature of the accounting and securities issues implicated in the Second Indictment; (ii) the millions of pages of documents relevant to the investigation, including 41 deposition transcripts;[13] and (iii) the fact that the First Grand Jury took more than <u>twenty months</u> to assess the same evidence.

Because grounds may exist to dismiss the Second Indictment on this basis, the Court should order discovery of grand jury materials.  The <u>Mahoney</u> case is particularly instructive in this regard.  In <u>Mahoney</u>, 495 F. Supp. at 1270, a first grand jury heard testimony from witnesses and did not return an indictment.  A second grand jury was presented only with summaries of the testimony and an account by an investigator of his interviews of the witnesses.  <u>Id.</u> at 1276-77. The court allowed disclosure of the full transcripts of all proceedings before the second grand jury, explaining that "use of summaries of testimony in grand jury proceedings is inherently suspect," particularly where live witnesses were available but not called due to "administrative convenience."  <u>Id.</u> at 1276, 1277.  Notably, the court explained that "mere administrative convenience" is antithetical to the government's responsibility to "justly administer[] its criminal law system."  <u>Id.</u> at 1275.

Here, "administrative convenience" apparently caused the government to obtain an indictment in as little as one day, even though there was no urgency requiring such a summary process.[14]  Neither the Court nor Defendants know whether the government, in it its zeal to return the Second Indictment, improperly characterized testimony in its presentation to the Second Grand Jury, but we do know that summary evidence must have been used.  Under such

---

[13]   Whereas <u>Carcaise</u> found dismissal appropriate where the government improperly attempted to summarize 1,160 pages of civil deposition testimony, here the case for dismissal is even greater, where there are approximately 7,600 pages of SEC testimony.

[14]   Under the terms of the deferred prosecution agreement, the Company has an obligation to cooperate with the government, which would presumably include making its personnel available for re-examination before a new, taint-free grand jury investigating the government's charges.  (<u>See, e.g.</u>, Deferred Prosecution Agreement ¶¶4, 32.)

circumstances, Defendants, as in <u>Mahoney</u>, should be entitled to compare the summary testimony with the fuller investigation by the First Grand Jury to determine the accuracy of the summary testimony and whether it provided an adequate basis to support a finding of probable cause.[15]

### D. Reasonable Grounds Exist To Believe That Improper Legal Instructions Were Given To The Grand Juries That Would Require Dismissal

The U.S. Attorney and the Assistant who was personally responsible for presenting this case to the First Grand Jury have publicly and repeatedly stated incorrect propositions of law relating directly to this case.  Given such public mischaracterizations of the law, reasonable grounds exist to believe that the government provided improper legal instructions to each of the grand juries.  Because an incorrect instruction may require this Court to dismiss the Second Indictment, Defendants need discovery of the grand jury proceedings to determine whether the grand juries were presented with proper legal instructions.

To fulfill its duty as an investigatory body, and to decide whether probable cause exists, a grand jury must be properly instructed on the law.  For this reason, courts will dismiss an indictment when the government provides the grand jury with erroneous legal instructions.  For example, in <u>United States v. Peralta</u>, 763 F. Supp. 14, 15 (S.D.N.Y. 1991), the government incorrectly defined constructive possession of a gun.  <u>Id.</u> at 20.  The court therefore dismissed the indictment, finding that there was a "high probability, if not a certainty, that the grand jury" was "misled" about the controlling law.  <u>Id.</u> at 20; <u>see also</u> <u>United States v. Cote</u>, 929 F. Supp. 364, 368 (D. Ore. 1996) (dismissing indictment, in part, because prosecution's grand jury instructions contained errors of law).

---

[15]    In the alternative, Defendants request that the Court view the material *in camera* to decide for itself whether there was any improper summarizing of evidence before the Second Grand Jury.

Putting aside the propriety of the government discussing facts relevant to a pending case, the U.S. Attorney's recent article on the Deferred Prosecution Agreement raises serious questions whether, as in Peralta, the prosecutors here mischaracterized the law to the grand jurors, perhaps resulting in indictments based on erroneous legal advice. First, the prosecutors expressly (and incorrectly) state that the securities laws require "disclosing all material facts." Christie & Hanna, 43 Am. Crim. L. Rev. at 1048. Of course, there is no such requirement. See, e.g., In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997) ("possession of material nonpublic information alone does not create a duty to disclose it"); ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Sec. Litig.), 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."); In re Sofamor Danek Group, Inc. 123 F. 3d 394, 400 (6th Cir. 1997) (No *per se* duty to disclose material sales practices because "[m]ateriality alone is not sufficient to place a company under a duty of disclosure."). Indeed, Christie's and Hanna's stated formulation leaves no room at all for the existence of "material nonpublic information." Such a notion runs counter to the most basic principles of American capital markets. After all, it is well documented that corporations could not operate efficiently if they were required to disclose every single piece of material information at all times to competitors and the public alike. See, e.g., Donald C. Langevoort, Investment Analysts and The Law of Insider Trading, 76 Va. L. Rev. 1023, 1029 (1990) ("For instance, a company with a new product coming out might well be reluctant to have competitors learn of it too far in advance. Yet the information about the plans is material and would presumably have an upward influence on the stock price.").

Second, the prosecutors have stated that the mere act of discounting pharmaceutical sales amounts to securities fraud where it results in wholesaler customers purchasing beyond some hypothetical "normal" level. See Christie & Hanna, 43 Am. Crim. L. Rev. at 1056 (authors opine that "channel stuffing . . . constitutes securities fraud"). But as Defendants point out in their motions to dismiss, court after court has flatly stated the opposite:  it simply is not illegal to give customers a discount, a tactic that by its very nature is designed to impact a customer's buying patterns. See, e.g., Greebel v. FTP Software, Inc., 194 F.3d 185, 202-03 (1st Cir. 1999) ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course . . . .").[16]

The government is simply wrong as a matter of law to suggest that there is an obligation to disclose every material fact known to corporate insiders or that offering discounts constitutes a crime.  The government's potentially erroneous legal instructions are especially prejudicial here, as the summary nature of the Second Grand Jury proceeding necessarily elevates the importance of the legal instruction.  The Defendants are entitled to discovery of the grand jury proceedings to determine whether the same legal errors that Messrs. Christie and Hanna shared with the public in their article were also shared with the grand jury.  See generally United States v. Abounnajah, No. CR-91-00146(CBA), 1991 WL 42895, at *2-*3 (E.D.N.Y. Mar. 1991) (ordering the government to provide grand jury instructions to the defendant because the instructions were "potentially relevant" to the defendant's expected motion to dismiss).

---

[16]   See also In re Cytyc Corp. Sec. Litig., Fed. Sec. Rptr. 93, 225, at 96,078-79 (D. Mass. March 1, 2005) ("pull-ins or deep discounts are not the nefariously manipulative scheme that [prosecutors] make them out to be") (report and recommendation of Magistrate Judge, accepted and adopted by District Court on March 22, 2005); In re Trex Co., Inc. Sec. Litig., 212 F. Supp. 2d 596, 608-11 (W.D. Va. 2002) (offering early buy-ins, extended dating and rebates, without more is insufficient to state a claim for securities fraud).

### E.   Discovery Is Needed To Determine The Adequacy Of The *Voir Dire*

Finally, Defendants need discovery to determine whether prospective members of the Second Grand Jury were subject to sufficiently thorough *voir dire* in light of the U.S. Attorney's inflammatory and prejudicial remarks after the return of the First Indictment.

In this case, a vigorous and thorough *voir dire* of prospective grand jurors was especially necessary to protect Defendants' constitutional right to an impartial grand jury. As described in greater detail in Mr. Schiff's omnibus motion to dismiss the Second Indictment, the U.S. Attorney's personal attack on Defendants following the return of the First Indictment was disseminated widely by the media and on the internet, potentially reaching the venire to be empanelled as the Second Grand Jury. (Schiff Omnibus Brief at 9-11.) The U.S. Attorney's misconduct therefore created a grave risk of tainting the Second Grand Jury. Indeed, in response to Mr. Schiff's objection as to the prejudicial effect of the U.S. Attorney's remarks on the petite jury pool, the government conceded the importance of *voir dire*: "in the face of overwhelming pre-trial publicity that truly threatens to taint the jury pool, a court can always conduct more probing voir dire." (Government's Response to Defendants' Omnibus Pretrial Motions, July 27, 2006, Docket No. 20, at 62) Without discovery of the *voir dire* transcripts and the questionnaires, if any, presented to the Second Grand Jury, Defendants cannot ensure that a sufficiently "probing" *voir dire* took place.[17]

---

[17]   A district court unquestionably has the authority and responsibility to monitor the selection of grand jurors and to excuse a biased grand juror. See Fed. R. Crim. P. 6(h) (court may excuse grand juror "[a]t any time for good cause"); 28 U.S.C. §1866(c)(2) (court may remove juror "on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings"). Courts have not hesitated to question prospective grand jurors about potential biases and remove those individuals who cannot fulfill their duties impartially. See United States v. Gibson, 480 F. Supp. 339, 344 (S.D. Ohio 1979) (holding that district court did not abuse its discretion by removing union-member from grand jury when union was potential subject of investigation); United States v. Maine Lobster Co., 160 F. Supp. 122, 125 (D. Me. 1957)

22

## II.     THERE IS NO COUNTERVAILING REASON TO CONTINUE TO SHROUD THE GRAND JURY PROCEEDINGS IN SECRECY

In the unique circumstances of this case, Defendants' need for disclosure far outweighs the scant need to maintain whatever remains of grand jury secrecy.

First, because the grand jury has completed its investigation and returned an indictment, the traditional factors supporting the secrecy of ongoing grand jury proceedings no longer apply.[18]  The Defendants are not accused of violent crimes, and there can be no concern about Defendants attempting to flee, intimidating witnesses, or suborning perjury, particularly because Defendants already have access to testimony provided by numerous witnesses to the SEC.  See Mahoney, 495 F. Supp. at 1276 ("the need for secrecy is greatly reduced [where] the grand jury has completed its work and returned an indictment"); Obiuwevbi, 1990 WL 36733, at *3 (after return of indictment, government is not prejudiced because "[d]isclosure of the grand jury minutes will not jeopardize any ongoing investigations nor present any risk of harm to witnesses

---

(holding that district court did not abuse its discretion by removing lobsterman from grand jury when lobster industry was subject of investigation).

[18]     The Third Circuit has identified the following factors as justifying secrecy of on-going grand jury proceedings in the ordinary course:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure [sic] the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

United States v. Rose, 215 F.2d 617, 628-29 (3d Cir. 1954) (district court abused its discretion in not requiring disclosure of a defendant's grand jury statement), cited approvingly in Douglas Oil Co. v. Petrol Stops Nw., 441 U.S. 211, 219 n.10 (1979).  Grounds 1, 2, 3, and 5 are all irrelevant after the grand jury has returned an indictment as they are addressed to the operation of the specific grand jury while it conducts its investigation; only the fourth factor remains post-indictment, as it "is a concern for the operations of future grand juries."  Mahoney, 495 F. Supp. at 1273 (allowing disclosure of grand jury material).

23

who might be reluctant to testify"); see also Dennis, 384 U.S. at 870 (stating that "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it") (internal quotations and citations omitted).

Second, much of the information that Defendants seek will ultimately be disclosed in any event, either pursuant to 18 U.S.C. §3500, or in the course of discovery in the criminal and civil cases against Grand Juror Smith.  Thus, the issue before this Court is not whether this information will be disclosed, but when.  Defendants request no more than accelerated disclosure to enable them to explore fully the extent of the violation of their constitutional rights.

Third, the government has already released or allowed to be released to the public numerous aspects of the First Grand Jury proceedings.  The government made no effort to file the charges against Smith under seal, nor did the government redact any portion of the complaints. The complaints were filed in open court and openly discuss the details of the First Grand Jury, including dates when individuals testified, statements made by prosecutors to grand jurors, exhibits shown to the grand jurors, and the oaths that the grand jurors took.  (See, e.g., D.N.J. Compl. at ¶¶3, 4, 6, 7, 15, 17, 18; S.D.N.Y. Compl. at ¶¶13-14, 16-18, 21, 23-24, 26, 28.) The government has publicized this information on the internet and in official press releases and press conferences.  The government has even required that others be willing to disclose grand jury materials, mandating as part of its deferred prosecution that the Company agree to any request by the government to disclose matters occurring before the grand jury.  (See Deferred Prosecution Agreement at ¶31(c).)  The government cannot have it both ways: it cannot selectively disclose grand jury material to suit its own interests, but then deny Defendants' request to other portions of the completed proceedings that may vindicate Defendants' constitutional rights.

24

Fourth, this Court has the discretion to fashion protective measures to balance any secrecy interest found to exist.  See Fed. R. Crim. P. 6(e)(2)(E) (disclosures to be ordered by the court "in a manner, and subject to any other conditions that it directs").  The Court could require the parties not to disseminate the material, for example.[19]  Given the extraordinary accusations leveled against Grand Juror Smith and the grave concerns that his alleged conduct raise about the integrity of the grand jury process, Defendants respectfully request that this Court fashion whatever protective measures it sees fit to permit Defendants access to the material they need.

Finally, any general, institutional interest in secrecy is outweighed by the need to promote the greater institutional interest of ensuring that a fair and unbiased grand jury has performed its constitutional roles, which necessarily requires discovery to determine:  (a) whether the corrupted First Grand Jury influenced the underlying investigation such as to taint the pending Second Indictment; (b) whether the prosecutors and grand jurors took inappropriate short-cuts by relying on summary testimony to return the Second Indictment; (c) whether the grand jury was properly instructed on the law; and (d) whether prospective grand jurors were subjected to sufficiently thorough voir dire given the U.S. Attorney's inflammatory remarks following the First Indictment.  Preserving grand jury secrecy in the face of such outstanding concerns would elevate form over substance.[20]

---

[19]   Alternatively, the Court could order that Defendants participate in an in camera review of these materials.  Cf. United States v. Fowlie, 24 F.3d 1059, 1066 (9th Cir. 1994) ("As an alternative to actual disclosure, a district court may choose to allow defense counsel to participate in an in camera hearing so that any question of prejudice will be subject to adversarial presentation.").

[20]   Defendants also seek disclosure of any and all government certifications required by Fed. R. Crim. P. 6(e)(3)(B) attendant to disclosure of materials from the First or Second Grand Juries, and all Rule 6(e)(3)(E)(i) petitions to disclose and any transcripts of hearings on such motions and rulings thereupon.  Defendants further request all transmittal to all media outlets of the three press releases identified in App. Ex. I, J, and L.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their

motion to allow discovery of the grand jury proceedings in this matter.

By their attorneys,

/s/ David M. Zornow                      /s/ Richard M. Strassberg
David M. Zornow                          Richard M. Strassberg
Lawrence S. Spiegel                      Samantha L. Schreiber
Steven R. Glaser                         **Goodwin Procter LLP**
**Skadden, Arps, Slate**                 599 Lexington Avenue
  **Meagher & Flom LLP**       New York, New York 10022
Four Times Square                        (212) 813-8800
New York, New York 10036
(212) 735-3000                           and
**Attorneys for Frederick S. Schiff**
                                         Roberto M. Braceras
                                         James O. Fleckner
                                         **Goodwin Procter LLP**
                                         Exchange Place
                                         Boston, MA 02109
                                         (617) 570-1000
July 28, 2006                            **Attorneys for Richard J. Lane**

## CERTIFICATE OF SERVICE

I hereby certify that this document filed, through the ECF system, will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on July 28, 2006.

/s/ Richard M. Strassberg
Richard M. Strassberg

LIBA/1718841

26