David M. Zornow
Lawrence S. Spiegel
Steven R. Glaser
SKADDEN, ARPS, SLATE
 MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Frederick S. Schiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Crim. No. 06-406-FSH |
| v. | ) |
| | ) |
| FREDERICK S. SCHIFF | ) |
| | ) |
| | ) |

## TRIAL BRIEF OF FREDERICK S. SCHIFF

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... iii

IN LIMINE MOTIONS ..................................................................................................................1

I.    The Government's Fact Witnesses Should Be Precluded From Offering
      Testimony Regarding The Materiality Of Mr. Schiff's Alleged Misstatements Or
      Omissions And Whether Certain Information Should Have Been Disclosed To
      The Investing Public ...........................................................................................................1

      A.    Background ...............................................................................................................2

      B.    Because Neither Analysts Nor Employees Are "Reasonable Investors,"
            Their Opinions About Materiality And Disclosure Are Irrelevant And Will
            Prove More Prejudicial Than Probative...................................................................3

      C.    Testimony Of The Government's Fact Witnesses About Materiality And
            The Necessity Or Propriety Of Disclosure In This Case Should Be
            Precluded As Improper Expert Opinion Testimony .................................................5

            1.    The Government May Not Elicit Expert Testimony From Its Fact
                  Witnesses .....................................................................................................5

            2.    Opinion Testimony About "Materiality" And The Necessity Or
                  Propriety Of Disclosure In This Case Must Also Be Precluded
                  Because It Calls For A Legal Conclusion.....................................................9

II.   The Government Should Be Precluded From Offering Evidence Of The Amount
      Of The Decline In BMS Market Capitalization After Certain Company
      Announcements..................................................................................................................12

      A.    Background .............................................................................................................13

      B.    The Government Has Failed To Adduce Any Competent Evidence Of
            Shareholder Loss Related To The Purported Curative Disclosures........................14

      C.    The Aggregate Dollar Value Of The Decline In BMS Stock Is Irrelevant............15

      D.    The Aggregate Dollar Value Of The Decline In BMS Stock Is
            Inadmissible Under Federal Rule Evidence 403....................................................16

III.  The Court Should Grant Defendants' Pending In Limine Motions And Deny
      Those Filed By The Government.......................................................................................19

PRE-TRIAL MANAGEMENT ...................................................................................................23

IV.     The Jury Should Not Be Presented With A Copy Of The Superseding Indictment..........23

V.      The Court Should Allow Prospective Jurors To Record Their Answers To The
        Joint Voir Dire Questions ...................................................................................................25

VI.     The Court Should Order The Exclusion Of Witnesses From The Courtroom
        Pursuant To Federal Rule Of Evidence 615 .......................................................................25

CONCLUSION...............................................................................................................................26

## TABLE OF AUTHORITIES

### CASES

In re Adams Golf, Inc. Securities Litigation, 381 F.3d 267 (3d Cir. 2004)......................16

Basic Inc. v. Levinson, 485 U.S. 224 (1988).......................................................................3

Berckeley Investment Group, Ltd. v. Colkitt, 455 F.3d 195 (3d Cir. 2006)...............10, 11

Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207
    (D.C. Cir. 1997) .......................................................................................................10, 11

In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001) ............................................17

City of New York v. Pullman Inc., 662 F.2d 910 (2d Cir. 1981) .......................................24

Gehl ex rel. Reed v. Soo Line Rail Road Co., 967 F.2d 1204 (8th Cir. 1992) ..................24

Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488 (9th Cir. 1986) ............................24

Government of Virgin Islands v. Edinborough, 625 F.2d 472 (3d Cir. 1980)...................25

Ieradi v. Mylan Laboratories, Inc., 230 F.3d 594 (3d Cir. 2000) .......................................3

Mars, Inc. v. Coin Acceptors, Inc., No. CIV A 90-49 JCL, 1996 WL 34385065
    (D.N.J. June 27, 1996) ........................................................................................... 11-12

In re Merck & Co. Securities Litigation, 432 F.3d 261 (3d Cir. 2005) .............................15

Morales v. City of New York, No. 99 Civ. 10004(DLC), 2001 WL 8594
    (S.D.N.Y. Jan. 2, 2001).................................................................................................24

Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000) ........................................................3, 11, 15

People v. Moore, 525 N.E.2d 460 (N.Y. 1988) ........................................................... 23-24

SEC v. Bausch & Lomb, Inc., 420 F. Supp. 1226 (S.D.N.Y. 1976), aff'd, 565
    F.2d 8 (2d Cir. 1977).......................................................................................................4

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) .............................................3

United States v. Brown, 776 F.2d 397 (2d Cir. 1985) .........................................................7

United States v. Copple, 24 F.3d 535 (3d Cir. 1994).........................................................17

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2002) ...............................................7, 8, 9

United States v. Farrington, 389 F.2d 357 (6th Cir. 1968) .................................................17

United States v. Forbes, No. 03:02CR0264 (AHN) (D. Conn. filed Sept. 30, 2006) ................................................................................................................................. 18-19

United States v. Freeman, 498 F.3d 893 (9th Cir. 2007) .....................................................7

United States v. Grinage, 390 F.3d 746 (2d Cir. 2004) .......................................................7

United States v. Hanna, 293 F.3d 1080 (9th Cir. 2002)...................................................4, 5

United States v. Jacques Dessange, Inc., No. S2 99 CR 1182 (DLC), 2000 WL 294845 (S.D.N.Y. Mar. 21, 2000) .................................................................................24

United States v. Mendoza, 236 F. App'x 371 (10th Cir. 2007), cert. denied, 128 S. Ct. 416 (2007)...................................................................................................................7

United States v. Nacchio, No. 05-cr-00545-EWN, Order and Memorandum of Decision Limiting Testimony of Financial Analysts (D. Colo. Mar. 26, 2007)............4

United States v. Scop, 846 F.2d 135, modified on other grounds on reh'g, 856 F.2d 5 (2d Cir. 1988)......................................................................................................10, 11

United States v. Shanahan, No. 04-126-01 B, Memorandum Supporting Defendants' Motion in Limine No. 4 (D.N.H. Oct. 31, 2006)................................. 17-18

United States v. Sokolow, 91 F.3d 396 (3d Cir. 1996)........................................................17

United States v. Theodoropoulos, 866 F.2d 587 (3d Cir. 1989), overruled in part on other grounds by United States v. Price, 76 F.3d 526 (3d Cir. 1996).......................7

United States v. Van Dyke, 14 F.3d 415 (8th Cir. 1994).....................................................23

United States v. Warner, 396 F. Supp. 2d 924 (N.D. Ill. 2005)..........................................25

United States v. Young, 745 F.2d 733 (2d Cir. 1984) ..........................................................7

## RULES AND REGULATIONS

17 C.F.R. § 243.100 (2007) ..................................................................................................3

Federal Rule of Criminal Procedure 16(a)(1)(G)..................................................................6

Federal Rule Evidence 401 ..................................................................................15, 16, 17

Federal Rule Evidence 402 ..............................................................................3, 15, 16, 17

Federal Rule Evidence 403 ............................................................................................3, 16

Federal Rule Evidence 615 .................................................................................................25

Federal Rule Evidence 701 ...................................................................................................6

Federal Rule Evidence 701 advisory committee notes (2000 amendments) .......................6

Federal Rule Evidence 702 ..............................................................................................6, 10

Federal Rule Evidence 702 advisory committee notes (2000 amendments) ................... 6-7

Federal Rule Evidence 704 advisory committee notes (1972 proposed rules)....................9

Federal Rule Evidence 704(a)..............................................................................................9

Selective Disclosure and Insider Trading, Securities Act Release No. 7881,
    Exchange Act Release No. 43,154, Investment Company Act Release No.
    24,599, 65 Fed. Reg. 51,716, 51,722 (Aug. 24, 2000)............................................... 3-4

## MISCELLANEOUS

5 Business and Commercial Litigation in Federal Courts § 62:77 (Robert L. Haig,
    ed., 2d ed. 2005)................................................................................................................6

4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence
    § 702.03[3] (Joseph M. McLaughlin, ed., 2d ed. 2007) ................................................9

75 Am. Jur. 2d Trial § 126 (2007) .....................................................................................23

Defendant Frederick S. Schiff respectfully submits this trial brief pursuant to the Court's

Order, dated January 24, 2008.  Through this submission, Mr. Schiff:

- Moves in limine to preclude the government's fact witnesses from offering opinion testimony regarding the materiality of Mr. Schiff's alleged misstatements or omissions and whether certain information should have been disclosed to the investing public (see Point I at 1, infra);

- Moves in limine to preclude the government from offering evidence of the amount of the decline in Bristol-Myers Squibb's ("BMS" or the "Company") market capitalization after certain Company announcements (see Point II at 12, infra);

- Requests the Court grant defendants' pending motions in limine and deny those filed by the government (see Point III at 19, infra);

- Requests the Court not provide the jury with a copy of the indictment during deliberations (see Point IV at 23, infra);

- Requests the Court allow prospective jurors to record their answers to the joint voir dire questions (see Point V at 25, infra);

- Requests the Court order the exclusion of witnesses from the courtroom pursuant to Federal Rule of Evidence 615 (see Point VI at 25, infra).[1]

## IN LIMINE MOTIONS

## I.    The Government's Fact Witnesses Should Be Precluded From Offering Testimony Regarding The Materiality Of Mr. Schiff's Alleged Misstatements Or Omissions And Whether Certain Information Should Have Been Disclosed To The Investing Public.

Mr. Schiff respectfully requests that the Court grant his motion in limine to preclude any

fact witnesses, such as Wall Street analysts and any current or former BMS employees, from

offering opinion testimony regarding the materiality of Mr. Schiff's alleged misstatements or

omissions and whether certain information should have been disclosed to the investing public.[2]

---

[1]   Mr. Schiff respectfully requests the opportunity to file additional motions in limine or other pre-trial motions as necessary; the government has yet to provide certain aspects of its Jencks material or a witness list, and a number of evidentiary issues are being discussed by the parties in an effort to avoid additional motion practice.

[2]   Should the Court grant this motion, it may obviate the need for the testimony of Charles Porten, one of the expert witnesses Mr. Schiff otherwise anticipates calling at trial.

### A.   Background

According to the superseding indictment, several of Mr. Schiff's alleged material misstatements or omissions occurred during conference calls with "professional securities analysts" who monitored and forecasted the financial performance of BMS.[3]  (Glaser Decl. Ex. 1 at 6, 20–22.)[4]  Mr. Schiff anticipates that the government, during its case-in-chief, will call one or more of these analysts to testify about statements Mr. Schiff made during conference calls or in other settings.  The government may also ask the analysts whether any facts that Mr. Schiff had not disclosed to them turned out to be (in their opinion) material.

The government's case-in-chief will also include the testimony of current or former BMS employees.  In the course of the parallel SEC investigation, the government repeatedly asked such employees whether, in their subjective opinion, various items of financial information were "material" or should have been disclosed.  For example:

Q:  Do you also believe that the company should have disclosed the fact that it had been engaging in channel-stuffing to inflate its sales and to spur its growth?

(Testimony of D. Brienza, Glaser Decl. Ex. 2 at 157.)

Q:  With regard to the excess inventory then, what do you believe was a material amount of excess inventory that required disclosure to the investors in 2000 and 2001?

(Testimony of J. Carroll, Glaser Decl. Ex. 3 at 167.)

Q:  And you feel that that was a material fact that should have been publicly disclosed given the magnitude, correct?

(Testimony of T. Fiumenero, Glaser Decl. Ex. 4 at 291.)

---

[3]    The Court is referred to the factual background contained in Mr. Schiff's previous filings; the facts detailed below represent those directly related to the arguments contained herein.

[4]    Citations to the Declaration of Steven R. Glaser appear throughout this Brief as "Glaser Decl. Ex. _."

Mr. Schiff anticipates that the government may well ask its analyst and employee witnesses substantially similar questions during its case-in-chief at trial.

B.      Because Neither Analysts Nor Employees Are "Reasonable Investors," Their Opinions About Materiality And Disclosure Are Irrelevant and Will Prove More Prejudicial Than Probative.

Because securities analysts and experienced BMS employees are not merely "reasonable investors," their opinions on materiality will offer little assistance to the jury, yet prove misleading, confusing, and unfairly prejudicial. The Court should therefore exclude such testimony pursuant to Fed. R. Evid. 402 and 403.

A Rule 10b-5 materiality analysis requires an "objective" inquiry into "the significance of an omitted or misrepresented fact to a reasonable investor." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976); see also Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). For omitted information to be material, a "'substantial likelihood'" must exist that its "'disclosure would have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information" available to that investor.'" Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (citations omitted). In analyzing materiality, courts assume that a "reasonable investor" does not possess specialized "expertise." Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 (3d Cir. 2000).

Securities analysts do not view materiality from the same vantage point as reasonable investors. The SEC has expressly recognized this in the context of Regulation FD, which prohibits an issuer of securities from revealing material information to analysts prior to public dissemination. See 17 C.F.R. § 243.100 (2007). Before finalizing Regulation FD, the SEC clarified that an issuer could still privately offer an analyst information that would be immaterial to a reasonable investor, "even if, unbeknownst to the issuer, that piece helps the analyst complete a 'mosaic' of information that, taken together, is material." Selective Disclosure and

3

Insider Trading, Securities Act Release No. 7881, Exchange Act Release No. 43,154, Investment Company Act Release No. 24,599, 65 Fed. Reg. 51,716, 51,722 (Aug. 24, 2000) (emphasis added). This exception reflects the SEC's understanding of the role analysts perform in the financial markets: They can offer a "valuable service" precisely because, "through some combination of persistence, knowledge, and insight," they draw "material conclusions" from "information that would not be significant to the ordinary investor." Id. An analyst's opinion about materiality thus tells a jury little about what a reasonable investor would find significant. See SEC v. Bausch & Lomb, Inc., 420 F. Supp. 1226, 1231 (S.D.N.Y. 1976) ("[A] skilled analyst could extract pieces of a jigsaw puzzle which would not be significant to the ordinary investor but which the analyst could add to his own fund of knowledge and use toward constructing his ultimate judgment."), aff'd, 565 F.2d 8 (2d Cir. 1977).

For that reason, the court in United States v. Nacchio, No. 05-cr-00545-EWN (D. Colo. Mar. 26, 2007) prohibited the government from introducing analyst testimony about materiality. See Glaser Decl. Ex. 5 at 6-9. It held that "the information a financial analyst personally finds important is irrelevant to whether that information would be important to a reasonable investor in deciding whether to buy or sell stock." Id. In fact, using a "'highly trained'" analyst as a proxy for a reasonable investor would prove as unhelpful as "'using a bloodhound to determine whether the average person would pick up a scent.'" Id. at 7 (quoting United States v. Hanna, 293 F.3d 1080, 1086 (9th Cir. 2002)). And even if analyst testimony had some probative value, the Nacchio court still would have excluded it under Federal Rule of Evidence 403 to avoid the "significant danger of misleading the jury into believing that it should judge materiality from the perspective of a highly trained financial analyst." (Glaser Decl. Ex. 5 at 8); see also Hanna, 293 F.3d at 1085-87 (reversing conviction where Secret Service agents testified that the defendant's letters were threatening; substituting the views of trained professionals for those of "an average,

4

reasonable person" deemed improper as the court had "substantially lowered the bar for the Government for proving the principal issue at trial").

Nacchio's holding resounds just as strongly in this case. Here, too, the analysts likely to testify for the government have extensive training and experience in valuing securities generally and BMS stock in particular, and thus can attribute significance to financial information about BMS that a reasonable investor would find immaterial. This is even more true of BMS employees, who possess greater Company-specific experience and knowledge and who can therefore glean more significant insights from seemingly immaterial information. Moreover, there is substantial risk that if such testimony is permitted it would mislead the jury into assessing materiality from the analysts', rather than the "reasonable investor's," standpoint; this would improperly lower the government's burden of proof with respect to this element of the offense. Cf. Hanna, 293 F.3d at 1086-87. Therefore, pursuant to Rules 402 and 403 of the Federal Rules of Evidence, the Court should preclude analysts and employees from offering opinion testimony about materiality.

C.    Testimony Of The Government's Fact Witnesses About Materiality And The Necessity Or Propriety Of Disclosure In This Case Should Be Precluded As Improper Expert Opinion Testimony.

1.    The Government May Not Elicit Expert Testimony From Its Fact Witnesses.

Even if analysts or employees could provide probative opinion testimony concerning materiality, that testimony would constitute expert opinion under Rules 701 and 702 of the Federal Rules of Evidence. The government has failed to provide such expert notice and is thus barred from offering this testimony. Assuming, arguendo, that the government had given Mr. Schiff the required notice, the relevant authority clearly prohibits the government from eliciting expert opinion testimony from its fact witnesses.

Rules 701 and 702 of the Federal Rules of Evidence draw a sharp line between lay and expert opinion, the distinguishing characteristic of the latter being "specialized knowledge." Compare Fed. R. Evid. 701 (lay testimony may not be based on "specialized knowledge"), with Fed. R. Evid. 702 (expert testimony appropriate if "specialized knowledge will assist the trier of fact"). Lay opinion may rest on direct observations or on inferences drawn using "'a process of reasoning familiar in everyday life.'" Fed. R. Evid. 701 advisory committee notes (2000 amendments) (citation omitted). It may not, however, rely on reasoning typical of "'specialists in the field'"; that form of reasoning is the domain of expert opinion. Id. (citation omitted). Moreover, the party introducing expert opinion must follow specific procedures – including advance disclosure to a defendant in a criminal proceeding, see Fed. R. Crim. P. 16(a)(1)(G) – and litigants may not "evade" these obligations "by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee notes (2000 amendments).

Although analysts and employees would principally serve as fact witnesses in this case, their opinions about the materiality of financial information would require "specialized knowledge" and therefore belong in the realm of expert testimony. To understand "whether the disclosure of certain information" would affect the market – which is the central question whenever materiality of that information is in dispute – parties to securities litigations rely on "experts," who are "generally securities professionals, economists or, occasionally, an attorney qualified in financial analysis." 5 Business and Commercial Litigation in Federal Courts § 62:77, at 1042 (Robert L. Haig, ed., 2d ed. 2005). Highly specialized expertise becomes essential because "stock prices are influenced by a wide number of variables," id., which a lay person cannot isolate or analyze using "'a process of reasoning familiar in everyday life.'" Fed. R. Evid. 701 advisory committee notes (2000 amendments) (citation omitted). In fact, the drafters of Rule 702 specifically contemplated that it would be the role of "experts" to "instruct the

6

factfinder . . . on how financial markets respond to corporate reports." Fed. R. Evid. 702 advisory committee notes (2000 amendments). Thus, if the government asks any of its fact witnesses to offer opinions about materiality, or about whether certain information should have been disclosed to the investing public, those witnesses would clearly be responding in an expert capacity.

Even had the government given Mr. Schiff requisite notice of analysts' or employees' expert testimony, that testimony should still be precluded as improper expert opinion by a fact witness. See United States v. Dukagjini, 326 F.3d 45, 53-54 (2d Cir. 2002).[5] The Third Circuit has long acknowledged that expert testimony poses an inherent risk of proving "overly persuasive to the jury because of the 'aura of special reliability and trustworthiness' surrounding expert testimony." United States v. Theodoropoulos, 866 F.2d 587, 592 (3d Cir. 1989) (citations omitted), overruled in part on other grounds by United States v. Price, 76 F.3d 526 (3d Cir. 1996); accord Dukagjini, 326 F.3d at 53-54. The Second Circuit's opinion in Dukagjini, which addressed this precise concern in the context of fact witnesses who also offer expert opinion testimony, is instructive here.[6]

In Dukagjini, the district court permitted a law enforcement agent who supervised the wiretapping of the defendant's communications to testify as an "expert" on "various code words" used in those communications. Id. at 49-50. The court of appeals held that the district court

---

[5]   See also United States v. Grinage, 390 F.3d 746, 750-51 (2d Cir. 2004); United States v. Freeman, 498 F.3d 893, 903-04 (9th Cir. 2007); United States v. Mendoza, 236 Fed. Appx. 371, 383-84 (10th Cir. 2007), cert. denied, 128 S. Ct. 416 (2007).

[6]   The same Second Circuit decisions that underlie the reasoning of Dukagjini, have been expressly embraced by the Third Circuit. See Theodoropoulos, 866 F.2d at 592 (citing United States v. Young, 745 F.2d 733, 765-66 (2d Cir. 1984) (Newman, J., concurring); United States v. Brown, 776 F.2d 397, 401 & n.6 (2d Cir. 1985)).

"failed to fulfill its gatekeeping function" under Rules 403 and 702 when it permitted the government to elicit expert testimony from its fact witness. Id. at 54-55.

Three "particular difficulties" posed by the agent's expert testimony persuaded the court of appeals that it should have been excluded. Id. at 53-54. "First, . . . when a fact witness . . . also functions as an expert for the government, the government confers upon him '[t]he aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use.'" Id. at 53 (alternation in original; citation omitted). Thus, "[s]imply by qualifying as an 'expert,' the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge." Id.

The second difficulty concerns the special risks of cross-examining an expert witness who is also a fact witness. See id. at 53-54. Impeaching an expert may prove "risky" in any trial, as questions "can backfire and end up bolstering" the expert's credibility. Id. at 53. This risk becomes unacceptable, however, in a case where "the expert is also a fact witness," because an unsuccessful cross-examination of the expert "may effectively enhance his credibility as a fact witness." Id. at 54.

The final difficulty highlighted in Dukagjini involves the jury's ability to make informed credibility determinations. See id. In assessing the expertise of an individual who also serves as a fact witness, "[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case" as a fact witness. Id. This danger of juror confusion cautions against permitting a fact witness to play the part of an expert.

The principles outlined in Dukagjini militate strongly against permitting securities analysts and BMS employees to offer their expert opinion testimony here. By enjoying the "'aura of special reliability and trustworthiness'" that surrounds experts, id., analysts and

8

employees would benefit from "unmerited credibility when testifying about" their first-hand interactions with Mr. Schiff. Id. at 53. At the same time, challenging their expertise may require Mr. Schiff to take unacceptable risks, since an unsuccessful cross-examination about their professional qualifications "may effectively enhance" their "credibility as . . . fact witness[es]." Id. at 54. The jury, moreover, would be forced into the unacceptable position of resting its credibility determinations on the uncertain line between analysts' and employees' expert analysis and their first-hand observations as fact witnesses. Accordingly, the Court should preclude, as improper expert opinion, any testimony about materiality or disclosure from the government's fact witnesses.

        2.      Opinion Testimony About "Materiality" And The Necessity Or Propriety Of Disclosure In This Case Must Also Be Precluded Because It Calls For A Legal Conclusion.

Analyst and employee testimony regarding materiality and whether certain information should have been disclosed to the investing public must also be precluded because it improperly calls for witnesses to draw legal conclusions.

The Federal Rules of Evidence prohibit expert opinions stated "in the language of statutes, regulations, or other legal standards that are at the heart of the case if that language has a separate, distinct, and specialized meaning in the law different from its meaning in the vernacular." 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.03[3] (Joseph M. McLaughlin, ed., 2d ed. 2007). Notes accompanying the Rules specifically instruct that Rules 701, 702, and 403 "stand ready to exclude" such legal questions as "'Did T have capacity to make a will?'" Fed. R. Evid. 704 advisory committee notes (1972 proposed rules). Although Rule 704(a) provides that "otherwise admissible" opinion testimony may embrace "an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704(a), expert opinion is not "otherwise admissible" unless it will "assist the trier of fact" in either

9

"understand[ing] the evidence or . . . determin[ing] a fact in issue." Fed. R. Evid. 702. And federal courts have established that "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not 'otherwise admissible.'" Burkhart v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1212 (D.C. Cir. 1997); see also United States v. Scop, 846 F.2d 135, 142 ("None of our prior cases . . . has allowed . . . repeated use of statutory and regulatory language indicating guilt."), modified on other grounds on reh'g, 856 F.2d 5 (2d Cir. 1988).

The Third Circuit likewise requires district courts to exclude any expert opinion stated in the form of a legal conclusion. It did so most recently in Berckeley Investment Group, Ltd. v. Colkitt, 455 F.3d 195 (3d Cir. 2006), a breach-of-contract action involving a sale of securities. The Berckeley defendant accused the plaintiff of recklessly misrepresenting that the securities at issue enjoyed an exemption from federal registration requirements. See id. at 208-09, 216. In response, the plaintiff submitted an expert's affidavit, which stated, among other things, that the plaintiff was not unreasonable in believing the securities were exempt, given common practices in the securities industry. Id. at 216-17. The Third Circuit held that only parts of the affidavit were admissible: While "the District Court did not abuse its discretion in admitting [the expert's] testimony regarding securities industry custom," id. at 218, it should have excluded the portion of the expert's affidavit "opining that in light of the . . . industry practice it was reasonable for [the plaintiff] to have believed that it was entitled to [an] exemption." Id. at 218. That portion of the expert's affidavit could not be admitted because it "concern[ed]" the plaintiff's "legal duties." Id.

The Third Circuit's reasoning in Berckeley Investment Group compels the conclusion that the government's witnesses in this case may not directly opine on the "materiality" of Mr. Schiff's alleged omissions, by using the term "material" or subtle variants thereof, such as

10

"important" or "significant." Such opinion would no less implicate "legal duties" than did the expert's improper testimony about reasonableness in Berckeley Investment Group. See id. And the questions Mr. Schiff anticipates the government may well ask its witnesses (for example, "Do you also believe that the company should have disclosed the fact that it had been engaging in channel-stuffing to inflate its sales and to spur its growth?" (see Testimony of D. Brienza, Glaser Decl. Ex. 2 at 82)) call for legal conclusions just as openly as the illustrative improper question "Did T have capacity to make a will?" in the notes to the Federal Rules of Evidence. Cf. Fed. R. Evid. 704 advisory committee notes (1972 proposed rules). In short, by inquiring directly about the "materiality" of Mr. Schiff's misstatements or the necessity of disclosure, the government would elicit from its witnesses a legal conclusion on an element of Mr. Schiff's alleged offense, something it is clearly prohibited from doing.[7]

If anything, the need to exclude expert testimony in this case is stronger than in Berckeley Investment Group, where the Third Circuit held that portions of the expert's affidavit should have been struck in the context of a summary judgment motion decided by the judge. See Berckeley Inv. Group, 455 F.3d at 198, 216-18. Here, by contrast, the government's witnesses would be using the term "material" or opining on the necessity of disclosure before a jury, where such improper opinion could cause irreparable prejudice. Cf. Mars, Inc. v. Coin Acceptors, Inc., No. CIV A 90-49 JCL, 1996 WL 34385065, at *1 (D.N.J. June 27, 1996) (stating the prohibition

---

[7] Use of the term "materiality" is especially inappropriate given that it is the precise term contained in the statute that Mr. Schiff allegedly violated. Courts routinely exclude such "expert" testimony. See, e.g., Burkhart, 112 F.3d at 1213-14 (holding that the district court "abused its discretion in permitting" an expert to testify in language "lifted directly from the text of" the applicable regulation); Scop, 846 F.2d at 136, 139-42 (reversing a criminal conviction for securities manipulation because the government elicited expert testimony in the form of statutory and regulatory language). The same is true for "significantly," which has been incorporated into the definition of "material," as well. See Oran, 226 F.3d at 282.

11

against legal conclusions by experts may be relaxed in cases that are "tried without a jury, which means that the utility of the expert testimony is untarnished by the downside risk that the factfinder will confuse the roles of witness and judge").

. . .

For the foregoing reasons, the Court should preclude any fact witnesses from offering opinion testimony regarding the materiality of Mr. Schiff's alleged misstatements or omissions and whether certain information should have been disclosed to the investing public.

## II.    The Government Should Be Precluded From Offering Evidence Of The Amount Of The Decline In BMS Market Capitalization After Certain Company Announcements.

The government has made clear that it wishes to prove materiality through evidence of the dollar value of the change in market capitalization in BMS stock after certain Company announcements. However, even if the Court grants the government's Motion In Limine No. 1 to admit evidence of market reactions to various BMS announcements, and even if the Court permits the government's expert to testify, the government should nonetheless be precluded from introducing evidence of the total market capitalization loss because it is irrelevant to a determination of materiality and the unfair prejudice would be manifest. Without regard to relevancy or accuracy, the government seeks to argue to the jury that investors lost $32 billion.[8]

---

[8]    The government's $32 billion market capitalization number is premised on a simple calculation of the decline in BMS's stock price from April 2002 through July 2002. See Glaser Decl. Ex. 8 at 4-5. Based on the government's recently filed expert report, the government is no longer examining the declines in BMS's stock price beyond April 25, 2002. See Glaser Decl. Ex. 17 at 10. Accordingly, the government's new calculation of market capitalization loss is likely to be lower, although still well into the billions of dollars.

12

This inflamatory claim would only confuse, mislead, and unduly prejudice the jury, and thus should be precluded.[9]

A.   Background

On April 12, 2007, the superseding indictment was returned alleging that BMS's shareholders lost "hundreds of millions of dollars" when the Company made certain announcements relating to wholesaler inventory levels beginning in April 2002. Glaser Decl. Ex. 1 at 16. During the next six weeks, the government twice repeated its claim that BMS's "shareholders sustained hundreds of millions of dollars in losses" because of the charged crimes. See Glaser Decl. Ex. 6 at 1; Ex. 7 at 4. A few weeks later, the government filed its motion in limine to admit evidence of BMS's market capitalization loss on certain dates in 2002 as evidence of the materiality of Messrs. Schiff and Lane's alleged misstatements and omissions. See Glaser Decl. Ex. 8 at 1. In that filing, the government claimed that the total market capitalization decline, i.e., the loss of shareholder value, exceeded $32 billion. Id. at 5; see also Glaser Decl. Ex. 9 at 8 ("investors suffered a loss of market capitalization of more than $32 billion.").[10] The government sought to prove this figure by simply offering evidence of the decline in BMS stock on certain days following Company announcements, and then multiplying the amount of the decline by the number of BMS's outstanding shares.

Mr. Schiff opposed the government's motion *in limine* on the grounds that the government's simplistic argument failed to demonstrate any causal link between Mr. Schiff's

---

[9]   This motion seeks alternative relief in the event that the Court denies Mr. Schiff's pending motion to exclude the testimony of the government's proffered expert, Dr. Wazzan; were the Court to grant that motion no evidence of stock price decline would be offered by the government, and thus it would be unable to make arguments to the jury regarding BMS's market capitalization decline.

[10]   The government has continued to flog the multi-billion dollar loss number since then. See Glaser Decl. Ex. 10 at 29:16-19; Ex. 11 at 72:24-73:10; Ex. 12 at 1.

13

alleged misstatements and omissions and the decline in BMS's stock. (Glaser Decl. Ex. 13 at 5-8.) Recognizing this, the Court directed the government to obtain an expert who would seek to rule out other causes for the stock price drop. See Glaser Decl. Ex. 14 at 50-51; Ex. 15 at 12-14. While the government has attempted on numerous occasions to revisit the Court's ruling, see Glaser Decl. Ex. 15 at 12-14; Ex. 16, the Court has held to it, and the government eventually filed the expert report of C. Paul Wazzan on February 6, 2008. Significantly, Dr. Wazzan simply concludes that "BMS's stock price reacts negatively (and statistically significantly) to BMS's announcements of April 1, 2002, April 3, 2002, and April 25, 2002," Glaser Decl. Ex. 17 at 10, without accounting for any of the multiple, distinct disclosures by BMS that occurred during or otherwise on the days of those announcements. Id. at 4, 7, and generally. Thus, Dr. Wazzan offers no nexus between any of Mr. Schiff's alleged misstatements or omissions and the stock decline on the dates in question.[11] In addition, Dr. Wazzan does not attempt any aggregate market capitalization calculation of investor loss, and implicitly recognizes the meaninglessness of such an exercise; he notes that with almost 2 billion outstanding shares, almost any decline in stock price will result in what would appear to be an enormous decline in market capitalization, which would say nothing about whether that decline was material.

B.     The Government Has Failed To Adduce Any Competent Evidence Of Shareholder Loss Related To The Purported Curative Disclosures.

As noted above, the Court has ruled that the government cannot prove materiality by simply adducing evidence of the change in BMS's market capitalization after certain Company announcements. And even if the Court had not already so ruled, the government's own expert did not find value in performing this calculation. Thus, the government has no legal or factual

---

[11] This is one of the grounds on which Mr. Schiff has moved to preclude Dr. Wazzan's testimony. See Glaser Decl. Ex. 18 at 11-13.

14

basis to advance arguments to the jury regarding market capitalization decline. On this ground alone, it should be precluded from making any arguments to the jury about it.

C. The Aggregate Dollar Value Of The Decline In BMS Stock Is Irrelevant.

Even if the government had competent evidence of the amount of shareholder loss related to the purported curative disclosures, the aggregate dollar value of the decline in BMS stock would be irrelevant under Fed. R. Evid. 401 and should be excluded under Fed. R. Evid. 402.[12] The Third Circuit does not consider every fact about the "market's reaction" to be relevant to materiality. In evaluating materiality on the basis of market movement, the Third Circuit has focused on the relative change (usually expressed in percentage terms), not absolute aggregate change in dollar value. See, e.g., In re Merck & Co. Sec. Litig., 432 F.3d 261, 269-70 (3d Cir. 2005) (finding a stock price "decline of little over 1%" insufficient to demonstrate materiality without discussing the absolute change in market capitalization); Oran, 226 F.3d at 285 (finding a "four-percent drop in share prices" indicative of materiality without discussing the absolute change in market capitalization).

The reason why an aggregate dollar value figure does nothing to assist a jury's consideration of materiality is aptly demonstrated by the evidence the government has repeatedly attempted to introduce in this case: a relative decline of 44% and an absolute aggregate decline of $32 billion. See Glaser Decl. Ex. 8 at 5, 6; Ex. 9 at 8; Ex. 12 at 1. Assuming the government could establish that BMS's stock price dropped 44% as a result of the alleged curative disclosures, it is irrelevant whether the absolute aggregate value of that decline was $32 billion, $3.2 billion, or $32 million. These aggregate values merely reveal how many shares lost 44% of

---

[12] The government admits that it need not prove market loss to establish materiality. See Glaser Decl. Ex. 9 at 4, 12. The government has not – and could not – claim that such evidence is relevant to any other issue at Mr. Schiff's trial.

15

their value; they do not tend to make that 44% decline more or less material. See In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 270, 277 & n.11 (3d Cir. 2004) (concluding that a 17% decline in stock price was material even if it amounted to an absolute decline of only $0.75 per share, or less than $5 million across 5.6 million outstanding shares). The irrelevance of market capitalization decline to a materiality analysis is underscored by the fact that BMS has 2 billion outstanding shares; thus, a mere fifty cent decline, which would hardly be unusual on a ordinary day of trading, could be said to have caused $1 billion in shareholder loss. Yet, assuming a stock price of $30, that fifty cent drop would amount to a mere 1.6% decline.

A simple hypothetical further reveals the folly in the government's reasoning. If a company with 100,000 outstanding shares was trading at $1.00, and declined 70% in one day, the total market capitalization loss would be $70,000. On the surface, comparing the market capitalization decline in this example would make it appear as if the stock price decline was far less material than the $32 billion loss to BMS shareholders alleged by the government here. But this is hardly the case, for a 70% decline in value is substantially more significant than a 44% decline. In other words, the dollar value of a decline in market capitalization adds nothing to the jury's inquiry into materiality. Accordingly, the market capitalization evidence will not make it "more probable or less probable" that Mr. Schiff's alleged misstatements had been material, and thus will not constitute "relevant evidence" under Fed. R. Evid. 401. The Court should therefore exclude it. See Fed. R. Evid. 402.

D.     The Aggregate Dollar Value Of The Decline In BMS Stock Is Inadmissible Under Federal Rule of Evidence 403.

The Court should also preclude the government from offering or eliciting evidence of the aggregate dollar value of the decline in BMS stock because of the danger that this evidence would cause undue prejudice, confuse the issues, and mislead the jury. See Fed. R. Evid. 403.

16

The government is seeking to introduce evidence that would highlight and dramatize the losses of BMS's shareholders without tying that loss to any of the allegedly fraudulent conduct in a blatant attempt to inflame the jury. This is precisely the type of evidence the Third Circuit has counseled district courts to exclude. See, e.g., United States v. Copple, 24 F.3d 535, 546 (3d Cir. 1994) (stating testimony concerning investor losses "created a significant risk that the jury would be swayed to convict [the defendant] as a way of compensating these victims wholly without regard to evidence of [the defendant's] guilt"); United States v. Sokolow, 91 F.3d 396, 406-07 (3d Cir. 1996) (finding testimony regarding personal adverse consequences to victims in mail fraud case was unfairly prejudicial under Fed. R. Evid. 403); cf. United States v. Farrington, 389 F.2d 357, 359-60 (6th Cir. 1968) (reversing a criminal conviction because the district judge, despite instructing the jury that the victims' losses did not constitute an element of the defendant's offense, referred to those losses in addressing the jury).

The dangers associated with highlighting investor losses is of heightened concern here because of the misleading nature of market capitalization loss calculations. Not only do these simplistic calculations fail to account for potentially confounding factors and other potential causes of the loss, they may dramatically overstate the amount of investor loss. See In re Cendant Corp. Litig., 264 F.3d 201, 242 & n.24 (3d Cir. 2001) (discussing why market capitalization loss calculations are improper measures of investor loss). Indeed, even the government's own expert has implicitly noted the misleading nature of aggregate dollar value figures. See Glaser Decl. Ex. 17 at 6 ("BMS is widely held with an average of 1,936,795,190 outstanding shares in 2002 (in other words each $1.00 decrease (or increase) in stock price would result in almost a $2 billion dollar decrease (or increase) in market capitalization. . . .").

The misleading and prejudicial nature of this type of evidence was cited by the court in United States v. Shanahan, No. 04-126-01 B (D.N.H. Oct. 31, 2006), a criminal securities fraud

17

case, as the basis to exclude evidence of an "astronomical" $1.3 billion market capitalization loss. See Glaser Decl. Ex. 19 at 7. "[U]pon hearing of the vast size of this decline," the Shanahan defendants argued, "the jury is likely to conclude that such a huge loss must have been the result of misconduct. And because it is the defendants who are standing trial, and who were in management positions during the relevant time period, a jury is likely to conclude that the defendants are the ones who engaged in this wrongdoing." Id. The district court agreed, holding market capitalization evidence inadmissible under Rule 403 because it would prove "highly prejudicial" and "potentially very misleading," and would give rise to "the obvious danger . . . that the jury will reach a verdict not based on logic but on sympathy." (Glaser Decl. Ex. 20 at 40-42.)

The danger of unfair prejudice and jury confusion would, if anything, prove more potent here than in Shanahan. In both trials, the government's market capitalization evidence would serve principally as an irrelevant embellishment of victim impact. And while a loss of $1.3 billion seemed "astronomical" in Shanahan, the government here has accused Mr. Schiff of causing losses another order of magnitude greater. The very enormity of the alleged $32 billion loss would inflame juror sentiments and mislead them into believing fraud must have occurred, irrespective of the actual merits of the government's case. In turn, Mr. Schiff could be convicted – not because of the evidence in this case – but because of the jury's emotional desire to punish someone for the losses experienced by BMS's shareholders.

This is not a speculative concern. One of the Assistant United States Attorneys ("AUSA") prosecuting this case, recently demonstrated in another case the government's willingness to inflame the jury in this manner. At the beginning of his opening statement in United States v. Forbes, No. 03:02CR0264 (AHN) (D. Conn. filed Sept. 30, 2006), the AUSA focused the jury's attention on the purported market capitalization loss: "The shareholders lost billions," he stated,

18

immediately adding that "[t]he defendant caused people . . . to lose billions of dollars when the defendant's fraud came to light." (Glaser Decl. Ex. 21 at 32-33.) Moments later, he made the same point again: "The United States will prove that the shareholders lost more than 14 billion dollars . . . ." Id. at 33. He then repeated the $14 billion figure four more times. See id. at 34 ("The evidence will show that the defendant . . . coordinated this $14 billion fraud."); id. at 35 ("Let me turn to the $14 billion fraud that the defendant directed"); id. at 51 ("Cendant shareholders lost more than $14 billion"); id. ("After Cendant shareholders lost $14 billion"). Finally, he summarized the opening statement for the jury by saying, "That's an overview of what the Unites States intends to prove about the $14 billion fraud that the defendant directed." Id. at 53. The Court should prevent the government from reprising such tactics here.

. . .

For the foregoing reasons, Mr. Schiff requests that the Court preclude the government from offering evidence of the amount of market capitalization decline in BMS stock after certain Company announcements.

## III. The Court Should Grant Defendants' Pending In Limine Motions And Deny Those Filed By The Government.

Mr. Schiff respectfully requests that the Court grant defendants' pending motions *in limine*. For the Court's convenience, they are:

- Mr. Schiff's Motion In Limine to Exclude Evidence of or Reference to Regulation S-K, Item 303 and SEC Staff Accounting Bulletin No. 99 (filed February 7, 2008; Docket No. 170);

- Mr. Schiff's Motion In Limine to Exclude Certain Arguments and Evidence Concerning Mr. Schiff's Purported Omission Liability (filed December 19, 2007; Docket Nos. 153 & 154; re-filed December 28, 2007; Docket No. 155);[13]

---

[13] This motion has also been cast as a motion to dismiss those aspects of the indictment predicated on invalid legal theories. See Glaser Decl. Ex. 22 at 43:14-17. Furthermore, pursuant to the Court's January 24, 2008 Order, Mr. Schiff filed a letter brief on January 26,
*(cont'd)*

- Mr. Schiff's Motion In Limine to preclude the government from referring or offering evidence at trial related to revenue recognition issues, including the Restatement (filed June 15, 2007; Docket Nos. 94, 95, & 96);[14]

- Defendants' Joint Motion In Limine to preclude the government from referring or offering evidence at trial related to reserve accounting or GAAP (filed June 15, 2007; Docket Nos. 94, 95, & 96);[15]

- Defendants' Joint Motion In Limine to preclude the government from referring or offering evidence at trial related to the buildup of wholesaler inventory that was alleged to have occurred in 1991 and 1992 (filed June 15, 2007; Docket Nos. 94, 95, & 96);

- Defendants' Joint Motion In Limine to preclude the government from using the term "channel stuffing" at trial (filed June 15, 2007; Docket Nos. 94, 95, & 96);

- Defendants' Joint Motion In Limine to preclude the government from introducing any evidence concerning the Deferred Prosecution Agreement (filed June 15, 2007; Docket Nos. 97, 98 & 99);[16]

- Defendants' Joint Motion In Limine to preclude the government from introducing any evidence concerning BMS's civil settlement with the Securities and Exchange Commission (filed June 15, 2007; Docket Nos. 97, 98 & 99);[17]

- Defendants' Joint Motion In Limine to preclude the government from introducing any evidence concerning BMS's private class action settlement (filed June 15, 2007; Docket Nos. 97, 98 & 99).[18]

---

(cont'd from previous page)

2008 formally incorporating certain of Mr. Lane's arguments into this motion. Glaser Decl. Ex. 23.

[14] In response to Mr. Schiff's motion, the government stated that it did not intend to offer evidence relating to revenue recognition or the Restatement in its case-in-chief, but that it reserved the right to offer such evidence if "the defendants themselves open the issue by arguing that, contrary to the facts, the company's revenue recognition in 2000 and 2001 was proper." (Glaser Decl. Ex. 24 at 3.)

[15] In response to the defendants' motion to preclude evidence relating to reserve accounting or GAAP, the government represented to the Court that it was not planning to introduce any evidence on reserve manipulation in its case-in-chief. Glaser Decl. Ex. 14 at 2-3. The government failed to respond, however, to Mr. Schiff's request that the government be precluded from cross-examining defense witnesses on this subject. See Glaser Decl. Ex. 25 at 15.

[16] In response to the defendants' motion, the government indicated that it did not intend to offer evidence of the DPA in its case-in-chief. See Glaser Decl. Ex. 24 at 2-3.

[17] In response to the defendants' motion, the government indicated that it did not intend to offer evidence of BMS's SEC settlement in its case-in-chief. See Glaser Decl. Ex. 24 at 2-3.

As noted in footnotes 14-18 above, the government responded to a number of defendants'

motions in limine by stating that it did not intend to offer such evidence in its case-in-chief;

essentially reserving the right to do so if Mr. Schiff "opens the door." (Glaser Decl. Ex. 24 at 2-

3; Ex. 14 at 84:25-85:8.) The defense continues to believe that Mr. Schiff's motions in limine

should be granted in toto for the reasons set forth therein. If, however, the Court decides to

allow the government to inject these issues into the case for "rebuttal" purposes, the defense

should be given adequate notice of and an opportunity to object to the government's position as

to what specifically constitutes "door opening" with respect to each category of potential

evidence.[19] As the Court has previously stated:

> I don't want surprises, and I don't want people so hamstrung by fears of door
> opening that they are constantly worried about trying, in defending the case the
> best way they see fit on both sides, but primarily for the defense. Because the
> opening the door problem is a sort of a little tidbit that's been left out there. It's
> not a tidbit, I mean it's real and there is a doctrine. But I think they have a right to
> know, to the best extent reasonably foreseeable, what kinds of things they might
> ask would lead you to argue that the door had been opened, so that they either
> know to move in advance to clarify it, or not to ask it, if it's not a serious or
> necessary inquiry, that kind of thing.

(Glaser Decl. Ex. 14 at 86:16-87:3.)[20]

---

*(cont'd from previous page)*

[18] In response to the defendants' motion, the government indicated that it did not intend to offer evidence of the civil settlement in its case-in-chief. See Glaser Decl. Ex. 24 at 2-3.

[19] For example, the defense previously raised the question whether the government would claim the door had been opened to re-direct regarding the Restatement and accounting issues if the defense elicited testimony on cross-examination that a witness believed the Company's sales to wholesalers were properly accounted for at the time and constituted "real sales for real dollars." (Glaser Decl. Ex. 14 at 85:9-18.) In response, the Court indicated that both lines of testimony would be proper and would not open the door to broader re-direct. See id. at 85:19-22.

[20] The defense assumes the government will instruct its witnesses not to refer to issues it has agreed not to inject into its case-in-chief.

21

Mr. Schiff also reasserts his opposition to the government's pending motions *in limine*

and requests that they be denied.[21] They are:

- United States' Motion In Limine No. 1 to admit evidence of the stock market's reaction to BMS's disclosures of wholesaler excess inventory (filed June 15, 2007; Docket No. 93);[22]

- United States' Motion In Limine No. 2 to preclude defendants from arguing that the government must prove that the defendants knew their conduct was illegal (filed June 15, 2007; Docket No. 93);[23]

- United States' Motion In Limine No. 3 to preclude defendants from making "missing witness" arguments (filed June 15, 2007; Docket No. 93);[24]

- United States' Motion In Limine No. 4 to preclude defendants from arguing or eliciting evidence of their "clean records" or lawful behavior on other occasions (filed June 15, 2007; Docket No. 93);

- United States' Motion In Limine No. 5 to preclude defendants from arguing or introducing evidence that other individuals could have been charged with additional crimes but were not (filed June 15, 2007; Docket No. 93);

- United States' Motion In Limine No. 6 to preclude defendants from offering evidence of prior, self-serving hearsay statements (filed June 15, 2007; Docket No. 93).

---

[21] As the Court is aware, the government recently filed a motion in Limine to Admit Statements of Co-Conspirators Pursuant to Federal Rule of Evidence 801(d)(2)(E) (filed February 12, 2008; Docket No. 171). That motion will be fully briefed on February 22, 2008 and is scheduled to be heard on February 26, 2008.

[22] As Mr. Schiff explained in his Daubert brief, the government's proposed expert testimony does not meet the standards of Federal Rules of Evidence 403 and 702 and is therefore inadmissible.

[23] In its reply brief, the government noted that the parties were in substantial agreement with regard to the willfulness mens rea requirement and requested that the Court defer resolution of this motion until after the submission of proposed jury instructions. See Glaser Decl. Ex. 9 at 14.

[24] Despite the fact that the government initially captioned its third motion in limine as a motion to "preclude[] [the defendants] from making 'missing witness' arguments," see Glaser Decl. Ex. 8 at 13, in its reply brief the government recast its motion as merely a request that both parties provide notice before making missing witness arguments, see Glaser Decl. Ex. 9 at 15.

## PRE-TRIAL MANAGEMENT

## IV. The Jury Should Not Be Presented With A Copy Of The Superseding Indictment.

The defense requests that the Court not provide the jury with a copy of the superseding indictment for its deliberations because of the unfair prejudice that would result from the jury's review of the government's one-sided, statement of the case.[25] See, e.g., United States v. Van Dyke, 14 F.3d 415, 423 (8th Cir. 1994) ("[W]e agree with appellant that the indictment, as the government's formal charging document, gave the jury a one-sided view of the case . . . ."); People v. Moore, 525 N.E.2d 460, 464 (N.Y. 1988) (Kaye, J., dissenting) ("[T]here is substantial danger that a deliberating jury will be unduly influenced by the physical presence of the indictment in the jury room, because it emphasizes the prosecution's theory of the case and ignores relevant factors favoring defendant."); 75 Am. Jur. 2d Trial § 126 (2007) ("Even in charging the jury, it is considered the better practice not to read the pleadings to the jury . . . ."). Indeed, there is a real concern about the tendency of jurors to be unduly influenced by official-looking documents, especially when such documents contain a conclusion from a prior proceeding that is within the province of the jury.

> [T]he indictment stands as an accusation of guilt by grand jurors who have reviewed the prosecutor's evidence and found it sufficient. There is a risk, therefore, that a juror concerned about the credibility of the People's witnesses or the sufficiency of the evidence will be mollified by the unhesitating assertions of guilt contained in the indictment. This bolstering effect cannot be underestimated; jurors faced with the conflicting assertions of counsel and the frustrating neutrality of the Trial Judge may be hard pressed to ignore these powerfully worded official accusations of guilt, especially when the words are physically before them in the jury room.

---

[25] The Court recently stated that it was willing to consider deviating from its normal practice of providing the jury with a copy of the indictment for its deliberations. See Glaser Decl. Ex. 25 at 8:16-19 ("It doesn't have to remain the practice if there's a good reason not to, and law in support of that.").

Moore, 525 N.E.2d at 464 (Kaye, J., dissenting) (citation omitted). Cf. Gehl ex rel. Reed v. Soo
Line R.R. Co., 967 F.2d 1204, 1207-08 (8th Cir. 1992) (affirming exclusion of safety assessment
because "[t]here is a danger that government reports, even if not particularly probative, will
nonetheless sway the jury by their 'aura of special reliability and trustworthiness'") (citation
omitted); Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1500 (9th Cir. 1986) ("A jury
may find it difficult to evaluate independently evidence of age discrimination after being
informed that the EEOC has already examined the evidence and found a violation."); Morales v.
City of New York, No. 99 Civ. 10004(DLC), 2001 WL 8594, at *6 n.4 (S.D.N.Y. Jan. 2, 2001)
(court excluded memorandum containing the findings of the Civilian Complaint Review Board
because admission "would confuse the jury by offering conclusions regarding the factual issues
the jury was to determine"); United States v. Jacques Dessange, Inc., No. S2 99 CR 1182 (DLC),
2000 WL 294845 at *5 (S.D.N.Y. Mar. 21, 2000) (Cote, J.) ("[I]t is appropriate to exclude a
report where presenting it to the jury for consideration will give it 'an aura of special reliability
and trustworthiness which would not [be] commensurate with its actual reliability.'") (alteration
in original) (quoting City of New York v. Pullman Inc., 662 F.2d 910, 915 (2d Cir. 1981)).

Moreover, the submission of the indictment would not redound in any corresponding
benefit to the jury, as it will have already been read a joint statement of the case before voir dire
and an agreed upon summary of the indictment at the outset of trial, and given detailed
instructions and guidance from the Court before retiring to deliberate.[26]  While it is true that
some courts have allowed jurors to review indictments in complex matters with large numbers of

---

[26]  As this motion makes clear, the defense does not believe the indictment should be read to
jurors at the outset of trial.  Accordingly, pursuant to the Court's January 24, 2008 Order, the
defense will work with the government to draft an agreed upon summary that can be read to
the jury.

24

counts, see, e.g., United States v. Warner, 396 F. Supp. 2d 924, 930 (N.D. Ill. 2005) ("The court agrees with the government that this complex case involves too many counts (22) to withhold the indictment from the jury in its entirety."), Mr. Schiff has only been charged with two counts and the government itself has noted that it is a "plain fact that this is a simple and straightforward case." Glaser Decl. Ex. 24 at 1. There simply is no compelling justification for submitting the indictment to the jury in this case.

**V.      The Court Should Allow Prospective Jurors To Record Their Answers To The Joint Voir Dire Questions.**

Pursuant to the Court's Order, dated January 24, 2008, the parties are to submit twenty case-specific questions to be asked aloud to the jury pool during voir dire.[27] The questions are to be drafted to elicit a "YES" or "NO" response by the proposed jurors, where a "YES" response will prompt further questioning at sidebar. Because it is unlikely that proposed jurors will be able to remember their response to each of the twenty questions – and the fact that proper follow–up at sidebar depends on their ability to do so – the defense requests that the Court provide the jurors with a simple checklist (see Glaser Decl. Ex. 28) whereby they can record their affirmative responses. This process will ensure proper voir dire, result in more efficient and orderly sidebars, and generate no additional administrative burden for the Court.

**VI.     The Court Should Order The Exclusion Of Witnesses From The Courtroom Pursuant To Federal Rule Of Evidence 615.**

The defense requests that the Court order the exclusion of witnesses from the courtroom pursuant to Fed. R. Evid. 615. See Gov't of Virgin Islands v. Edinborough, 625 F.2d 472, 473-74 (3d Cir. 1980) (noting the mandatory nature of Fed. R. Evid. 615).

---

[27]     The defense recently proposed twenty case-specific questions to the government. (Glaser Decl. Ex. 27.) The defense has also asked the government to consider a few background

*(cont'd)*

25

## CONCLUSION

For the foregoing reasons, Mr. Schiff respectfully requests an order (1) precluding the

government's fact witnesses from offering opinion testimony about the materiality of Mr.

Schiff's alleged misstatements or omissions and whether certain information should have been

disclosed to the investing public; (2) precluding the government from offering evidence of the

amount of the decline in BMS's stock price after certain Company announcements; (3) granting

defendants' pending motions in limine and denying those filed by the government; (4) stating the

Court will not provide the jury with a copy of the superseding indictment during its deliberations;

(5) allowing prospective jurors to record their answers to the joint voir dire questions; and (6)

ordering the exclusion of witnesses from the courtroom under Federal Rule of Evidence 615.

FREDERICK S. SCHIFF

By his attorneys,

/s/ Steven R. Glaser
David M. Zornow
Lawrence S. Spiegel
Steven R. Glaser
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Frederick S. Schiff*

February 22, 2008

_____
*(cont'd from previous page)*

questions that the defense believes should be added to the Court's standard list of general
questions to the jury pool.