FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| | : |
| UNITED STATES OF AMERICA, | : Hon. Faith S. Hochberg |
| | : |
| | : Crim. No. 06-406 (FSH) |
| v. | : |
| | : **OPINION & ORDER** |
| FREDERICK SCHIFF, | : |
| | : Date: March 19, 2008 |
| Defendant. | : |
| | : |
| | : |
| | : |

**HOCHBERG, District Judge:**

This matter comes before the Court upon Defendant Schiff's motion *in limine* to exclude

certain arguments and evidence concerning Mr. Schiff's purported "omission" liability [Dkt.

155].  Defendant Schiff has also moved to dismiss from Count Two a theory of omission liability

for statements made in Bristol-Myers Squibb's ("BMS") SEC filings [Dkt. 164].[1]  The Court has

considered the briefs of the parties, and oral argument on February 26, 2008, and several earlier

---

[1] Defendant Schiff originally moved to dismiss the indictment on May 4, 2007 [Dkt. 52] on other grounds. That motion was denied on July 30, 2007 [Dkt. 125].  Defendant Lane, Defendant Schiff's alleged co-conspirator and then-joint defendant, moved to dismiss Count Two of the indictment on grounds related to the instant motion. Defendant Schiff indicated at the oral argument on that motion on October 30, 2007 that he joined in the motion. Thereafter, the Defendants cases were severed upon joint motion of the Government and both Defendants.  When Defendant Schiff filed the motion *in limine* [Dkt. 155] currently before the Court, he incorporated by reference certain arguments from Defendant Lane's motion to dismiss.  The Court ordered that Defendant Schiff provide his arguments separately, which he did by letter-brief dated January 26, 2008 [Dkt. 164].

To the extent that Defendant Schiff also moves to dismiss "scheme" liability from Count Two, as stated orally on March 11, 2008, the motion is denied and the Court finds that the Government has adequately pled liability under Rule 10b-5(a) and (c).  Without hearing the evidence related to these charges, the Court is not in a position exclude "scheme" liability as part of a motion to dismiss.  The Court will consider after the Government's evidence has been presented whether the case can be presented to the jury under both a Rule 10b-5(b) and a Rule 10b-5(a) and (c) or only pursuant to Rule 10b-5(b).

dates when the issue of omission liability arose.

This matter also comes before the Court upon Defendant Schiff's motion to exclude proposed Government expert testimony under *Daubert* [Dkt. 180, 221] and the Government's omnibus motion to exclude proposed defense expert testimony [Dkt. 190, 222].[2]  The Court has made its determination after considering the written submissions of the parties, and after having an evidentiary *Daubert* hearing and oral argument on March 11, 2008.

Trial had been scheduled to begin in July 2007, which was then adjourned at the joint request of all parties until September 2007, and then adjourned again until January, 2008. On November 1, 2007, the Court granted the joint application for severance and again adjourned the trial date to permit the parties additional time to obtain expert witnesses.  Trial was rescheduled to commence March 17, 2008, then adjourned to March 24, 2008.  For the reasons given below, the Court issues a narrow ruling dismissing one theory of omission liability and providing *Daubert* rulings on proffered experts.  The Court expects that trial will proceed as scheduled on all remaining theories of conspiracy, misrepresentation, omission, aiding and abetting, and "scheme" liability on both Counts of the indictment on March 24, 2008.

I.      **Background.**

The original indictment in this case, filed in May 2006, included charges that Defendant Schiff had violated GAAP and had employed improper accounting procedures related to reserve accounts and revenue recognition.[3]  In April, 2007, the Government filed a Superseding

---

[2] The Government moved to exclude the proposed testimony of five defense experts: Roman Weil, Felicia Battista, Charles Porten, Adam Fein, and R. Glenn Hubbard.  Prior to the *Daubert* hearing, Defendant Schiff withdrew the application to admit the testimony of Roman Weil and Felicia Battista.  Thus, the Government's motion to exclude this testimony is **DENIED AS MOOT**.

[3] Defendants were previously indicted on substantially the same charges in June, 2005. (*See United States v. Schiff*, 05-cr-474 (FSH).)  Because of problems with the grand jury that returned the original indictment, that indictment was dismissed and the original indictment in this case was filed in May, 2006.

Indictment [Dkt. 49].  In the Superseding Indictment, the Government made an effort to remove the accounting issues from the case.  Thus, charges related to GAAP accounting and corporate reserves were removed from the indictment.  Nonetheless, the parties continued to dispute whether the accounting issues had been completely excised.

To further remove accounting issues from the trial, the Government entered into a stipulation (the "Stipulation") with Defendant Schiff and joined in the Defendants' motion to sever.  The Stipulation replaced in the indictment the phrase "artificially inflated BMS's sales and earnings" with "created a false and misleading picture of Bristol's business performance."  The Stipulation also mandates that the following instruction be read to the jury:

> Defendant "Schiff is not charged with engaging in any improper accounting practices that violated any principle of quantitative accounting, whether expressed in GAAP or otherwise, including in connection with the recognition of revenue paid by wholesalers to BMS for the pharmaceutical sales at issue in this case."[4]

In both the conspiracy and substantive counts, the indictment charges both express misstatements and omissions to state.  The motion to dismiss omission liability relates only to specific challenged misstatements and omissions to state in the SEC filings and corollary misstatements and omissions on analyst calls, and does not affect the theory of the case based on numerous other alleged misstatements and omissions to state in analyst calls.  (*See* Dkt. 154-20 (listing alleged misstatements not challenged by the instant motion).)[5]

---

[4] The stipulated changes to the Superseding Indictment have been agreed to by Defendant Schiff and the Government, but a new indictment has not been formally entered.  The parties represented at the *Daubert* hearing on March 11, 2008 that this issue would be resolved shortly.

[5] Moreover, while Defendant Schiff challenges various statements as "inactionable puffery" and mere "forward-looking," statements, for the reasons discussed below, the Court here rules only on the alleged omissions in the SEC filings and the statements on analyst calls that constitute mere recitation of sales and earnings figures from the SEC filings.  The Court will reserve decision on the sufficiency of all other alleged misstatements and omissions on analyst calls until the charge conference. (*See infra* Sections III and IV.)

To further clarify the allegations of false or misleading statements charged against Defendant Schiff, the Court ordered the Government to list all alleged misstatements and omissions it would seek to prove.  The Government provided this information on November 30, 2007 (the "Bill of Particulars").  The Government detailed over 100 statements on analyst calls (in the space of 14 single-spaced pages).  It also identified omissions in SEC filings (but no express misstatements in the SEC filings).

As its theories of the case have evolved, the Government has asserted different legal theories about why Defendants had a duty to speak upon which liability for alleged omissions to state is based.[6]  Finally, at oral argument on February 26, 2008, the Government was again pressed to state the basis of Defendant Schiff's legal duty to speak underlying his alleged omissions to speak in the SEC filings.  This time, a new legal theory was stated:  Defendant Schiff's liability for omissions to state in the SEC filings stemmed from prior misleading statements of both Defendant Schiff and Defendant Lane on analyst calls, linking alleged

---

[6] In its brief responding to Defendant Lane's motion to dismiss Count Two of the Superseding Indictment, the Government argued that Defendants omitted from their public statements and SEC filings the "true nature of BMS's sales based on the earnings management practice of channel stuffing."  (Dkt. 60 at 23.)  When pressed to separate duty to disclose from the materiality of information disclosed, the Government asserted that Defendants had an affirmative duty to correct misleading statements of other officers based on a general fiduciary duty.

The Third Circuit's opinion in *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000), sets forth three instances where an individual may be deemed to have a duty to disclose such that he can be liable for the failure to speak: (1) where there is insider trading; (2) where there is a statute requiring disclosure; and (3) where the defendant himself has made an incomplete or misleading prior statement.  The Court informed the Government that it was disinclined to expand the language of *Oran* to include a fourth instance based on "general fiduciary duties" of a corporate officer.

The Government then appeared to argue that Defendant Schiff's duty for omissions in the SEC filings stemmed from certain regulations including Regulations S-K, Item 303.  (*See* Dkt. 157 at 27-30.)  Premising liability in this way might have fit within the statutory duty prong of *Oran* with respect to Defendant Schiff, who was a corporate officer who signed BMS's SEC filings; however, the Government later explicitly disclaimed a statutory basis for a duty of disclosure by Defendant Schiff.  (*See* 1/23/08 Tr. at 50-51 ("THE COURT: All right.  Are you relying on a statutory duty of any kind?  MR. DREW: There's not a specific statute that we claim creates a duty.")  Why the Government chose to eschew a statutory basis for the duty to speak was not stated; nevertheless, the Government chose to proceed on some other theory of "duty to speak" that underlies omission liability.

4

misstatements on analyst calls to alleged omissions to state in the SEC filings as "all of a piece."[7]
(2/26/08 Tr. at 124-25.)  The Government having finally settled upon its legal theory, the Court
will permit no further "legal theory morphs" in this case, which has been awaiting a trial for
several years.

Because of the Stipulation, the Bill of Particulars, and abandoned theories of omission
liability, the analysis starts with what the Government concedes that Defendant Schiff is *not*
charged with:

1.  Inaccurate quantitative revenue figures in SEC filings and elsewhere;
2.  Concepts of revenue recognition and such words as would have been required by quantitative accounting principles;
3.  Omissions to state in the SEC filings based on insider trading;
4.  Omissions to state in the SEC filings based on a statutory duty of disclosure;
5.  Misstatements in the SEC filings;
6.  Substantive liability for acts of alleged co-conspirators under *Pinkerton*;
7.  Any misstatements or omissions other than those listed in the Bill of Particulars.

Given these negotiated constraints and waived theories of liability, the Government cannot
premise an omission to state in an SEC filing upon a misstatement in that SEC filing, because it
has not alleged *any misstatement* in the SEC filing.  This situation was created by the Stipulation
and Bill of Particulars, which left any omission to state in the SEC filing dangling and detached
from its corollary misleading statement.  Thus, the Government is left arguing that Defendant
Schiff had a duty to speak in BMS's SEC filings about alleged sales acceleration leading to
excess inventory build-up because he made alleged oral misstatements in prior analyst

_____

[7] The Government stated: "We're planning to argue that it is misleading to present the information in the
Q's and K's without the further explanation of the trend, the business practice that the company was using to make
its numbers, to hit its targets. But by the time we make that argument, Your Honor, the issue of Bristol's business
performance is already going to be in play in public.  Mr. Schiff will have -- we will have put in evidence of Mr.
Schiff having made statements on the analyst calls and elsewhere about that issue.  So that the K's and Q's are just,
they're all of a piece." (2/26/08 Tr. at 120.)

conference calls.  This theory attempts to fit omission liability into *Oran*'s third prong. (*See supra* n.6.)

## II.     Defendant Schiff's Duty to Speak in BMS's SEC filings.

Rule 10b-5 states, in pertinent part, that "It shall be unlawful for any person, directly or indirectly ... To make any untrue statement of a material fact *or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.*"  17 C.F.R. 240.10b-5(b) (emphasis added).  Thus, Rule 10b-5(b) examines an alleged omission *together with* "the statements made, in the light of the circumstances under which they were made," to see if the omitted words were "necessary" to make "the statement...not misleading."

In the Bill of Particulars, which is "a list of Defendants' statements [the Government] intends to identify as false," the Government states:

> The forms 10-Q filed for the first quarter, second quarter, and third quarter of 2000, the Form 10-K for 2000, and the Forms 10-Q for the first quarter and second quarter of 2001, all signed by defendant Schiff, *contain omissions* regarding BMS's business performance, in that they *omit* any reference to the effect of sales acceleration on reported sales and earnings.

(Dkt. 149-2 at 16) (emphasis added; citations omitted.)

No statements were identified as affirmative false or misleading statements in the SEC filings. The Government now wishes to argue that the Management Discussion and Analysis ("MD&A") section of the SEC filings contain omissions to state, but the Government does not connect the MD&A alleged omissions in the SEC filing to any "statements made."  Undoubtably, the Government's original theory was that the sales and earnings figures in the SEC filings were "misleading statements" by Schiff, and that the MD&A omitted to state the manner in which such sales figures were obtained, which was "necessary" to make the sales and earnings figures

6

not misleading "in light of the circumstances under which [both] were made" in the SEC filings. The Government abandoned the first part of that theory when it negotiated the Stipulation and filed the Bill of Particulars, which constrained by the Stipulation, identifies *no* misleading statements in the SEC filings.

It is well-settled that the non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information and "possession of material nonpublic information alone does not create a duty to disclose it." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *see Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). In *Oran*, the Third Circuit identified three ways that such a duty to disclose may arise: (1) when there is "insider trading"; (2) when there is "a statute requiring disclosure;"[8] or (3) where there is "an inaccurate, incomplete or misleading prior disclosure." 226 F.3d at 285-86. In this case, the prosecution has stated that the only basis for a duty to disclose that they are pursuing against Defendant Schiff is the third prong of *Oran*.

Thus, in order to proceed with the "omission to state" theory involving the SEC filings, the Government must identify the prior *statement* that forms the basis of Defendant Schiff's duty to disclose information in the MD&A section of the SEC filings necessary to make the "statement made not misleading" in the "light of circumstances under which they were made."

---

[8] While the Government might have chosen to proceed on a "statutory duty" theory of disclosure, this was expressly disavowed during a conference on Jan. 23, 2008.

### A.   Government's theory of duty based on "falsity of reported sales and earnings" in the SEC filings.

The Government argues that "the basis for the falsity of reported sales and earnings figures is that they omit any reference to the effect of sales acceleration and wholesaler excess inventory build up." (Dkt. 150 at 1.)  Thus, the Government argues that even if, per the Stipulation, Defendant Schiff is not charged with violations of quantitative accounting or revenue recognition, he can be held liable for omissions in SEC filings that he knows make the revenue figures provided therein misleading.  The Government thus simultaneously stipulates that the reported sales and earnings figures are not charged as a false statement by Defendant Schiff, and yet attempts to argue that the numbers are misleading by omission while removing GAAP principles from consideration.

The flaw in this argument is that, in this unusual case, the Government has stipulated that Defendant Schiff is *not* charged with knowledge of a revenue recognition falsity.  And, false sales and earnings figures are *not* identified in the Bill of Particulars.  Moreover, the meaning of the revenue numbers and whether or not they fairly represent sales and earnings is fundamentally an issue of accounting and revenue recognition, regardless of whether the accounting concepts are expressed numerically or in the profit and loss portion of the SEC filings or descriptively in words relating to those numbers in the MD&A section of those filings.  GAAP accounting consists of both numbers and descriptive words relating to such numbers.  But, in the Stipulation, the Government concedes that neither the quantitative numbers in the financial statements nor the accounting principles of revenue recognition are misstatements that could form the basis of liability for securities fraud under Section 10(b) and Rule 10b-5(b).  Because the Government signed the Stipulation, the sales and revenue figures in the SEC filings cannot

constitute a "misleading statement" upon which to base omission liability.  The Bill of Particulars sets forth no other misleading statements in the SEC filings.[9]

The "omission to state" the excess inventory build-up is thus not connected to any misleading statement made in the SEC filings.  There is no "omission to state a material fact necessary to make *the statement made* not misleading." By implication, "the statement made" is the sales and earnings figures, but the Stipulation negotiated that away, leaving an omission unattached to a "statement made."  Moreover, because in the Stipulation the Government concedes that Defendant Schiff is not charged with improper accounting practices, including those associated with revenue recognition, the Government cannot argue that the sales figures are misleading by omission of words necessary to reflect the true nature of the sales, because those are accounting concepts. In this way, the Stipulation seriously constrained the theories available upon which to premise omission liability in the SEC filings.  There are many other theories upon which this trial can, and will, proceed, at long last.

Furthermore, disclosures in the MD&A section are also governed by complicated statutes and regulations, and the Government did not oppose the defense motion *in limine* to bar such evidence from this criminal trial. (*See* Dkt. 170; Dkt. 208.)  As stated above, the Government might well have argued that Defendant Schiff had "a duty to speak" about the inventory build-up based on these statutory requirements, but the Government specifically eschewed this theory under prong (2) of *Oran*.  Thus, again, through their own strategy, the Government further limited the theories on which to premise omission liability for the SEC filings (as contrasted with straightforward misstatements and/or omissions liability within the analyst calls).

_____

[9] The Court presumes that the decision not to aver in the Bill of Particulars that the numbers in the SEC filings constitute false statements is because of the Stipulation's strictures.

9

In sum, omission liability cannot be premised on "falsity of reported sales and earnings" without violating the Stipulation, nor can it rest on the mere recitation of the SEC filings' numbers on the analyst calls, because that is essentially the same as the SEC figures themselves.

**B.      The Government's revised theory: duty based on prior statements on analyst calls.**

Because it is barred by the Stipulation from claiming a "misleading statement" in the SEC filings' sales figures, the Government's current theory, expressed at oral argument on February 26, 2008, is that misstatements on analyst conference calls created a duty of disclosure in the SEC filings.  Specifically, the Government stated at oral argument that:

> We're planning to argue that it is misleading to present the information in the Q's and K's without the further explanation of the trend, the business practice that the company was using to make its numbers, to hit its targets. But by the time we make that argument, Your Honor, the issue of Bristol's business performance is already going to be in play in public.  Mr. Schiff will have -- we will have put in evidence of Mr. Schiff having made statements on the analyst calls and elsewhere about that issue.  So that the K's and Q's are just, they're all of a piece.

(2/26/08 Tr. at 120.)

Thus, the dispute before the Court is the fair breadth of context between a prior misleading statement in one context (analyst conference call) and the alleged omission "necessary" to make that earlier "statement" not misleading.  The meaning of the phrase "in light of the circumstances under which they were made" in Rule 10b-5(b) is central to this analysis. The Government argues that the statements of Defendant Schiff are "all of a piece" such that his alleged misstatements on prior analyst calls created a duty to speak in the MD&A section of the SEC filings necessary to make the statements in the prior analyst calls not misleading.

In a criminal case, an indictment is not required to meet the heightened pleading standards operative in a civil case.  Nonetheless, in a criminal case, the Court must still ensure that a theory of liability meets the legal standards for the alleged crime.  There is no question that

the Government has properly charged express misstatements and omissions within the analyst conference calls themselves, and those theories will be tried.  The difficulty arises with the claim of "omission to speak" liability in an SEC filing when the claim is not that the alleged omission is connected to any misleading statement in the SEC filings.

It defies logic to charge as a crime that an utterance in an analyst conference call must have other words written in a later SEC filing in order to make the utterance in the prior phone call "not misleading."  It is not the law that a defendant incurs liability for the general flavor of his statements to the public; each proven misstatement constitutes a separate violation of Section 10(b).  The duty to disclose "necessary" information to make the statements not misleading arises when each statement was made.  Rule 10b-5(b) makes it unlawful to speak falsely or "to omit to state a material fact necessary in order to make *the statements made*, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. 240.10b-5(b) (emphasis added).

The Government argues that once a topic was "in play" in public statements to analysts, disclosure in the MD&A section of the SEC filings was required.  No law supports this.  The Government cites to *In re Craftmatic*, 890 F.2d 628 (3d Cir. 1989) for the proposition that even if the "raw financial data" is correct, a party can still be liable for misstatements in the SEC filings.  This proposition, as far as it goes, is undoubtably correct.  But, in *Craftmatic*, the defendants were charged with making express narrative statements in the SEC filings that were the basis for omission liability in the SEC statements.  In that case, the court found that the company's statements "attribut[ing its] past success primarily to its advertising, promotion, and marketing program" could form the basis of omission liability for failure to make statements necessary to make that statement not misleading.  Similarly, in other cases, where the defendants

11

were charged with providing quantitatively inaccurate financial figures, those statements could form the basis for additional liability.  *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001); *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418 (E.D. Pa. 2002) (basing omission liability on narrative statements attributing sales and earnings figures to "the wrong source" and liability based on specific violations of GAAP which constituted affirmative misstatements).  None of the cases cited by the Government stands for the proposition that a defendant has a duty to speak in SEC filings based on prior statements made in some other context.

The breadth of context between the alleged false statement on an analyst conference call and an alleged omission in the MD&A section of the SEC filings is too broad.  An "omission to state a fact necessary to make a statement not misleading" must, in fairness, be sufficiently closely connected that the speaker can reasonably be held to have considered the utterance and the silence to be related.  The text of Rule 10b-5(b) makes this clear:  "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, *in the light of the circumstances under which they were made*, not misleading."  17 C.F.R. 240.10b-5(b) (emphasis added).  Thus, the statements and related omissions must be considered in context and there must be a connected statement to which the alleged omission relates.  There is no fair connection here between the analyst conference call and the MD&A section of the SEC filing.

Second, even if there were a sufficient nexus between the alleged false statement on the analyst call and the alleged omission in the MD&A section of the filing, the jury would not even be permitted to reach this question of omission liability unless and until it had found Defendant Schiff guilty for making express false statements in the analyst calls.  As stated above, he would

only have potential omission liability under *Oran* prong (3) if the analyst call statement was in fact a prior false and misleading statement.  Thus, the novel theory of premising omission liability in an SEC filing upon a prior false statement in an analyst call adds nothing to the prosecution's case.[10]  The case will still go forward on legal theories related to alleged conspiracy, misstatements and omissions on analyst calls and misstatements listed under the heading "Other" in the Bill of Particulars, scheme/business practice liability under Rule 10b-5(a) and (c), and aiding and abetting violations of Section 10(b).[11]

Finally, although Defendant Schiff did not participate in any analyst calls before April 25, 2001, the Government argues that Defendant Schiff aided and abetted Defendant Lane's statements on earlier conference calls, giving rise to a liability for omissions in the SEC filings before Defendant Schiff made any public statements of any kind.[12]  The first alleged misstatement by Defendant Lane identified by the Government occurred on July 20, 2000.  For this additional reason, SEC filings prior to July 20, 2000 clearly cannot form the basis of a duty to speak by Defendant Schiff.  Absent a duty to speak, there is no "omission to speak" liability. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).

---

[10] The Government is not alleging here a "duty to correct." A "duty to correct" occurs "when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company must then correct the prior statement within a reasonable time."  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430-31 (3d Cir. 1997).  That theory is inapposite here because the Government has alleged that the statements on the analyst calls were misleading at the time made.

[11] Thus, if the Government proves that Defendant Lane made misleading statements, the Government may also attempt to prove that Defendant Schiff aided and abetted those statements.

[12] Substantive aiding and abetting liability relating to false statements is a separate charge in Count Two of the indictment and is not at issue here.

III.     **Admissibility of Defendant Schiff's Statements on Analyst Calls**

The analyst calls where Defendant Schiff participated are admissible as relevant evidence and party admissions.  The parties were instructed at the February 26, 2008 oral argument to meet and confer as to the portions of the calls that would be played to the jury.  At the start of trial, the agreed upon portions will be played as a composite tape in the precise order in which the statements occurred so that the jury hears the calls initially in the sequence in which they occurred.  Thereafter, either side may draw a witness's attention to any passage in any call.  At the charge conference, the prosecution will be required to provide a list to the Court of the specific statements from the analyst calls which it will argue to the jury form the basis of liability under Rule 10b-5(b).

IV.     **Defendant Lane's Statements on Analyst Calls**

Defendant Lane's statements on analyst calls are admissible as evidence of conspiracy and as evidence of Defendant Schiff's alleged aiding and abetting of Defendant Lane's misstatements.  At the charge conference, the prosecution will be required to identify the specific statements of Defendant Lane that it intends to argue that Defendant Schiff aided and abetted.  If the Government is proceeding on a theory that Schiff aided and abetted an omission to state by Lane, this will be permitted only if the Court finds a sufficient basis to support a duty to speak by Defendant Lane.  To the extent that an alleged statement by Defendant Lane is too unclear to form the basis of liability (e.g., because it contains only forward-looking statements and no evidence has been adduced to show that Defendant Lane did not believe the statement to be true at the time it was made), it will not be permitted to be argued to the jury as a basis for aiding and abetting liability for Defendant Schiff.  Furthermore, because the Government has specifically disavowed a *Pinkerton* theory of liability in this case, the Government may not argue that

14

Defendant Schiff has substantive liability under Count Two for acts performed by Defendant Lane in furtherance of the alleged conspiracy.

## V.      *Daubert* Challenges to Proposed Expert Testimony

Both sides proffered experts to testify about a range of topics.  The Government wishes to call Dr. C. Paul Wazzan to testify as to the materiality of observed stock price drops after BMS disclosures on April 1, 3, and 25, 2002.[13]  Defendant Schiff plans to call Dr. R. Glenn Hubbard to refute the testimony of Dr. Wazzan and to testify about: (1) his explanation of the stock price drops on the same dates; (2) whether the stock price of BMS was inflated during the January 2000 to April 2002 period; (3) whether analysts altered their expectations regarding BMS's future earnings based on disclosures about the inventory build-up; and (4) whether Defendant Schiff profited from his ownership of BMS stock during the relevant time period.

Defendant Schiff also seeks to call Dr. Adam Fein to testify about the business practices in the pharmaceutical industry to use sales incentives and about which information about BMS's inventory levels was publicly available during the relevant time period.  Defendant Schiff also seeks to call Mr. Charles Porten to testify about how investors analyze pharmaceutical companies and what information was publicly available to investors.[14]

Prior to the *Daubert* hearing, the parties agreed that there would be no challenge to the qualifications of any experts.  (*See* 2/26/08 Tr. at 7.)  For this reason, and because the Court sees no reason to believe that the proposed experts do not have appropriate qualifications, the Court will not read any of the motions to bring any challenge based on qualifications.

---

[13] At the start of the *Daubert* hearing, the Government announced that it was limiting Dr. Wazzan's testimony to the stock price drop following the April 3, 2002 disclosure.

[14] Defendant Schiff also proposed other experts whose testimony was withdrawn prior to the *Daubert* hearing because the Court granted Defendant Schiff's motion *in limine* to exclude certain SEC regulations and bulletins.

## VI.     Legal Standard for Expert Testimony

The metes and bounds of expert testimony are governed by the Federal Rules of

Evidence ("FRE").  FRE 702 states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Expert testimony is also cabined by FRE 703 (which sets forth appropriate bases of expert

opinions); FRE 704 (which prohibits "ultimate issue" testimony, or testimony as to Defendant's

state of mind); and FRE 705 (which governs the disclosure of facts underlying an expert

opinion).  Finally, an expert's testimony, like all other testimony, must be relevant to the matter

at hand pursuant to FRE 401, and more probative than prejudicial or confusing pursuant to FRE

403.

The standard by which expert testimony is tested is primarily set forth in two Supreme

Court cases, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (which specifically

addressed scientific testimony) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (which

expanded the holding in *Daubert* to all experts permitted to testify pursuant to FRE 702).  As a

threshold matter, an expert witness must possess "sufficient specialized knowledge to assist the

jurors in deciding the particular issues in the case."  *Kumho,* 526 U.S. at 156 (citation omitted).

That knowledge may be scientific, technical, or merely specialized, but it is essential that

whether an expert is "basing testimony upon professional studies *or* personal experience, [he or

she must] employ[] in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Id.* at 152.

16

It is also essential that a given opinion be both reliable and a good fit for the case at hand. *Daubert*. The Third Circuit has set forth an eight-part test for determining reliability, or whether an opinion is scientifically valid:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique=s operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*U.S. v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004). While the reliability requirement may be adjusted depending on the content of the expert testimony (for example, it is applied more rigorously in instances where the expert testimony is "scientific" or "technical," and less so in cases where the expert testimony is "experience-based"), it does impose a minimum standard. *Kumho*, 526 U.S. at 141-42. As for the requirement of "fit," the Third Circuit has emphasized that it is "one of relevance and expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999). When considering whether the proposed expert testimony "fits" the disputed factual issues in the case, "the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994).

The role of the judge with regard to expert testimony is to serve as a gatekeeper, and it is the judge who must decide if an expert's testimony reliably "fits" the case. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 748 (3d Cir.1994) ("*Daubert* makes clear for the first time at the Supreme Court level that courts have to play a gatekeeping role with regard to experts"); *Schneider ex. rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2000). The burden for

17

demonstrating admissibility lies with the proponent of the expert testimony, by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## VII.   Standard for Admission of Stock Price Drop Evidence

### A.   Background Related to Expert Testimony for Stock Price Drop Evidence.

On June 15, 2007, the Government filed a motion *in limine* to admit evidence of drops in BMS's stock price after April 1, 3, and 25.  (Dkt. 93.)  The Court noted in July 2007 that the ability of the jury to infer materiality from evidence of a stock price drop may be a complicated issue that may require expert testimony.  The Court was concerned that without an expert analysis of why a stock price dropped, the jury might improperly speculate that the stock price drop was a result of the criminal conduct charged in the case rather than other potential explanatory factors where multiple adverse events coincided temporally.[15]  The Court instructed the Government to either procure an expert to analyze the evidence or to submit pertinent circuit caselaw holding that an expert is unnecessary to demonstrate that the stock price dropped because of a particular disclosure rather than some other event. (*See* 7/10/2007 Tr. at 50-51.)  On July 17, 2007, the Government stated that it would soon submit legal authority to show that an expert was unnecessary.  No legal authority was submitted and instead the prosecutors stated that they would present expert testimony.  Thus, the Court concluded that the Government was no longer pressing its argument that no expert was required, having waived by non-submission of a brief on the issue..

In September, 2007, the Government represented that it had retained an expert who would testify about the stock price drop and the Court set a schedule for the exchange of expert

---

[15] Paragraph 46 of the revised Indictment directly invites such jury speculation by alleging that Defendant Schiff's alleged fraud "*caused* BMS shareholders to sustain *hundreds of millions of dollars in losses* after the nature and extent of BMS's channel stuffing and buildup of excess inventory was disclosed to the public beginning on or about April 1, 2002."  (Emphasis added.)

opinion summaries.  In an about-face, in January, 2008, the Government re-raised the issue and asked the Court to rule on whether expert testimony was required, despite having never briefed the issue the preceding July.  The Court reiterated that this issue had been closed for months and would not be reopened.  Because the Government was having difficulties producing the expert's summary of his opinion, the Court granted the prosecution an extension of time and a new schedule was set.  Opinion summaries were thereafter exchanged and a *Daubert* hearing was held on March 11, 2008, at which four proffered experts (one for the Government and three for Defendant Schiff) testified.

### B.      Use of Stock Price Reaction To Prove Materiality.

The Government seeks to introduce stock price drop evidence to show the materiality of Defendant Schiff's alleged misstatements.  Although specific dollar loss causation is not an element of the charged crime, if the Government wishes to use a stock price drop as evidence of materiality, it must demonstrate that public disclosure of the misstatements charged in the cindictment had an "appreciable negative effect" on the stock price.  *See Oran v. Stafford*, 226 F.3d 275, 283 (emphasis added) ("As the District Court noted, the July 8 disclosure had *no appreciable negative effect* on the company's stock price; in fact, AHP's share price rose by $3.00 during the four days after the Mayo disclosure. Under *Burlington*'s market test, this price stability is dispositive of the question of materiality.").  A simple hypothetical demonstrates this: if BMS announced a disclosure related to the charged misstatement on the same day that BMS lost a major patent case, a jury would not be able, without the assistance of an expert, to determine whether the observed drop in BMS's stock price was appreciably affected by the disclosure of the charged misstatement or not.  If the jury cannot determine such a relationship using common sense, then the stock price drop is not probative of the materiality of the alleged

misstatements absent expert methodology to separate the effects of the two factors and give the jury a basis to draw an inference without speculating.  This methodology need not measure the impact to a mathematical certainty, but it must do so sufficiently to determine if there is an "appreciable negative effect" on price by the curative announcement of the misstatement charged in the indictment.

As the Third Circuit noted in *Oran,* "[b]ecause in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed was immaterial as a matter of law.'"  *Oran*, 226 F.3d at 282 (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)).  Furthermore, a drop in stock price, by itself, does not establish that the decline was caused by the revelation of an earlier misrepresentation. *See Dura Pharm ., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ("A lower [share] price may reflect, not [] earlier misrepresentations, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.")  Courts often turn to economic experts to determine whether a particular announcement had an appreciable effect on the stock price. *See, e.g., Unger v. Amedisys Inc.,* 401 F.3d 316, 325 (5th Cir. 2005) (citations omitted) ("Demonstrating that market reactions are caused by company press releases should not, however, be an exercise in *post hoc, propter hoc* logic. Many variables have the potential to and do affect a stock price-the daily market average; national, local and industry-specific economic news; competitors' activities; and on and on. The overall volatility of the stock price and the speed of its reaction to company news may also be significant. To this end, expert testimony may be helpful because of the utility of statistical event analysis for this

20

inquiry."). The reason for the use of expert testimony in this context is clear: the formulas for calculating the reaction of the market to specific disclosures are complicated and not common sense observations that could be left to the jury.[16]

In the cases oft-cited by the Government for the admissibility of stock price drops without an expert, the charged crime was essentially the sole precipitating event that led to the price decline. For example, in *United States v. Ferguson*, the testimony sought to be admitted was specifically addressed to the materiality of the charged conduct. Crim. No. 3:06CR137 (CFD), 2007 WL 4556625 (D. Conn. Dec. 20, 2007) (Admitting testimony of analysts regarding whether their valuation of the company would have been different if they had known about the allegedly misstated loss reserves). Similarly, in *United States v. Bilzarian*, while the court commented that stock movement is a factor that might be relevant to a jury in determining materiality, in that case there was no actual stock price drop evidence because the stock had actually not decreased in value after disclosure. 926 F.2d 1285, 1288-89 (2d Cir. 1991).[17]

In this case, by excising the indictment and signing the Stipulation, the Government has chosen to vastly narrow the charges against Defendant Schiff. Moreover, facially unrelated adverse events at BMS also coincided with the announcements on April 1, 3, and 25. Thus, the charged conduct in this case does not encompass much of what BMS announced on the relevant

---

[16] In at least one criminal case, cited by the Defendants in their initial response to the Government's motion *in limine*, the court excluded evidence of a stock price drop because the alleged market loss was the result of "many complicated things . . . that aren't charged against defendants ." *United States v. Shanahan*, Case No. 04-CR-126-PB (D.N.H.), Nov. 7, 2006 Tr . at p. 50 [Dkt. 110-5]. The court there raised the same concerns as those raised in the instant case: that if a stock price loss is caused by multiple factors, only some of which are related to the charged conduct, the stock price loss evidence may not be probative of materiality and may be more prejudicial than probative if the jury is permitted to speculate as to the causes.

[17] Other cases cited by the Government such as *United States v. Surgent*, No. 04-364, 2006 WL 2535103 (E.D.N.Y. Sept. 1, 2006) and *United States v. Brown*, No. 04-159, 2006 WL 898043 (E.D.N.Y. April 4, 2006) are even less helpful. They stand for the clear proposition that market loss is not an element of securities fraud, but have nothing to say about the introduction of market loss evidence as evidence of materiality.

dates.[18]   Therefore, in this case, an observed stock price drop is probative of materiality of the alleged misstatements and omissions concealing excess inventory only with an analysis of whether the stock price drop is attributable to the public disclosures that relate to the charged conduct, rather than to disclosures that relate to other events at the company or in the market as a whole.   This case differs from cases without confounding factors because on the three dates preceding stock price drops, several adverse announcements (only some of which related to the charged conduct) were made simultaneously in BMS's press releases of April 1, 3, and 25, 2002.

**VIII.   C. Paul Wazzan: Government's Proposed Expert - Materiality of Stock Price Drop.**

C. Paul Wazzan holds a Ph.D. in Finance from the Anderson Graduate School of Management at the University of California, Los Angeles.   He is a director of Navigant Consulting, Inc. and an Adjunct Assistant Professor in the College of Business and Economics, Department of Finance and Law, at California State University, Los Angeles.   The parties do not challenge the qualifications of the proposed experts and the Court finds that he has sufficient expertise and experience in economics to perform economic analyses of stock price movements.

Dr. Wazzan submitted one report in this case which offered the following opinions: BMS's announcements on April 1, 3, and 25, 2002 caused statistically significant changes to BMS's stock price.   Dr. Wazzan performed an event study and also examined the stock price drops after controlling for exogenous market, industry, and economy-wide effects.   Thus, he concluded that the announcements had material, measurable and statistically significant impacts. He did not, however, attempt to control for the multiple simultaneous adverse BMS news that

---

[18] In particular, under the Stipulation, Defendant Schiff is not charged with misstatements about revenue recognition, nor with accounting fraud.  In addition, BMS made various disclosures about issues completely unrelated to the charges in this case (e.g., related to pending patent litigations and settlements and differentiating long-term demand reduction for certain drugs from near-term effects of an excess inventory workdown).  (*See* Gov't Exs. 439, 540, 475, 539)

22

included both events charged in the indictment and events not charged in the indictment. Dr. Wazzan also came to the uncontroverted opinion that BMS stock traded in an efficient market.

Defendant Schiff challenges the methodology and "fit" of this technique. In particular Defendant Schiff argues that Dr. Wazzan fails to control for BMS-specific confounding disclosures on the dates in question and that his methodology does not attempt to explain if any portion of the observed stock price drops can be attributed to the conduct charged in the indictment.

During extensive briefing on the *Daubert* issues, including several separate briefs by the Government, the Government's legal theory was always the same: to wit, that the Government need not establish the reason that the stock price dropped in order to offer it as evidence of materiality of the misstatements charged in the indictment. Thus, the Government argued repeatedly, the number of other confounding events on April 1, April 3, and April 25 do not matter because, as it stated in a bold headline, "the cause of BMS's stock decline is not at issue." (*See* Dkt. 190 at 18.) Unfortunately for the Government's theory, the stock price drop is only evidence of materiality if it *was* caused, to an appreciable degree, by announcements regarding the charged offenses.

On the morning of the *Daubert* hearing, immediately before the experts took the stand, the Government stated for the first time that it was "refashioning [its] motion in limine to admit the stock price drop evidence to show materiality just on [April 4, 2002]." (3/11/2008 Tr. at 6.) The lead prosecutor stated, "that will be more efficient. It narrows the scope of the issues that are in dispute today." (*Id.*) Defense counsel noted that "we learned of this probably 15 minutes ago." (*Id.*) At the time, the Government said nothing about any other changes in its legal theory or the impact on the expert's proposed testimony other than that. And the prosecutors continued

23

to argue that causation of the stock price drop is merely a civil loss causation concept that has

nothing whatsoever to do with materiality.  Thus, there was no notice of a new theory.

### A.      Dr. Wazzan's testimony

In his expert report, Dr. Wazzan analyzed all three dates using the same methodology.

Dr. Wazzan testified that he was not asked to attempt to disaggregate the causes of the observed

stock price drops.  He stated specifically that what he was asked to do "was to measure the fact

of the announcement as a whole.  Now I do recall that within the announcement there are several

pieces of information.  I wasn't asked to separate out the pieces of information contained within

the announcement."  (3/11/08 Tr. at 102.)   Dr. Wazzan agreed on cross-examination that "an

event study just identifies statistically-significant price changes" and "does not establish

causation."  (*Id.* at 104.)

### B.      Government's original response to Defendant's challenges

In response to the challenge to Dr. Wazzan's methodology, the Government argued that

it was not required to prove loss causation and thus was not required to disaggregate potential

causes of the observed price drops.  Specifically, the Government stated that "the Government is

not required to prove, and does not intend to establish, that Defendant Schiff's conduct caused

any loss."  (Dkt. 189 at 8.)  In the context of this case, that can only mean that the Government

does not intend to prove that Defendant Schiff's conduct, when announced, caused the stock

price drop.  This reading is underscored by the Government's brief heading: "**The Cause Of

BMS's Stock Decline Is Not At Issue**."  (Dkt. 190 at 18.)  Because reliance and loss causation

are not elements of a criminal 10(b)-5 prosecution, the Government argues, it need not

demonstrate any causal link to admit evidence related to the stock price drops as evidence of

materiality.  To expect a stock price drop to be appreciably affected by the criminally charged

24

conduct in order to be probative of materiality is dismissed by the Government's brief as "conflating" civil loss causation or reliance theories with the concept of "materiality" in a criminal case. Over and over again, the Government's multiple briefs hammered the same argument: it does not matter how many separate adverse things not charged in the indictment were announced simultaneously on April 1, 3, and 25, 2002, because the Government does not need to prove that the disclosure of Defendant Schiff's misstatements appreciably affected the stock price in order to prove materiality.

This argument fundamentally misses the most basic logic for stock price drop evidence to be relevant in the first place. Of course the Government is not required to prove dollar loss causation or reliance in this case, and it can prove materiality in ways other than with a stock price drop. But if the Government affirmatively seeks to introduce the stock price drop as evidence of materiality, it must demonstrate that the observed price drop is probative of the materiality of Defendant Schiff's statements (or, to be precise, the "curative announcement"). Without a causal link to the curative disclosure of the misstatement charged in the indictment, evidence of a stock price drop is not probative of the materiality of that alleged misstatement, and instead is more prejudicial or confusing than probative. In many criminal cases, such as *Ferguson*, the connection is immediate and clear. If there are no confounding factors in the disclosure or the market that would also cause a stock price drop, then causality is presumed by the efficient market hypothesis. In such circumstances, many courts have admitted stock price drop evidence as evidence of materiality without requiring expert analysis. Nonetheless, in a case like this one, where the defendant is charged with a circumscribed set of misstatements and specifically *not* charged with much other potentially criminal, fraudulent, or negative conduct by

25

BMS, such expert analysis is necessary to prevent jury speculation about whether the stock price drop is probative of the materiality of the charged conduct.

Without this link in logic, Dr. Wazzan's testimony does not "fit" the issues in this case and is not relevant to the primary issue of materiality. Dr. Wazzan's methodology is probative of the fact that BMS stock traded in an efficient market and he rules out market-related extraneous factors because he made an effort to control for them. However, he did not attempt to further fit his opinions to the case by controlling for BMS-specific disclosures that did not relate to the charged conduct on April 1, 3, and 25, 2002 because he was never asked by the prosecutors to do so. It was possible to construct a methodology to do so, he testified, but he did not do so because he wasn't asked. (3/11/08 Tr. at 100-03.) Thus, Dr. Wazzan's testimony will be admissible only to refute an argument, if one is made, that the market for BMS stock is not efficient or that extrinsic market factors account for the observed stock price drop.

Furthermore, the Government's last-minute decision to switch from seeking to admit evidence of the stock price drop on April 1 as well as April 3 raises an additional problem with Dr. Wazzan's report. The Third Circuit "has one of the clearest commitments to the efficient market hypothesis." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). In an efficient market, "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *Id.* (internal quotations omitted). Thus, even assuming *arguendo* that the disclosures on April 1, 2002 included the earliest disclosures related to the charged misstatements, if any portion of the April 3, 2002 disclosure is essentially a redisclosure of the same information disclosed on April 1, such redisclosure may not necessarily be the cause of any of the stock price drop observed on April 4, as distinguished from other adverse events simultaneously disclosed on April 3.

26

An event study methodology can only measure the impact of new and unexpected information on stock prices. *See, e.g.,* William O. Fisher, *Does the Efficient Market Theory Help Us Do Justice In a Time of Madness?*, 54 Emory L.J. 843, 872 (2005) ("An 'event study' is a statistical technique designed to determine whether a particular piece of new information had an impact on the price of a stock and, if so, the amount of that impact."). Dr. Wazzan agreed that it was important to differentiate between the first disclosure and subsequent disclosures of the same information. (3/11/08 Tr. at 103-04.) He did not do that either, because he was not asked to do so.

For example, in *Merck*, the Third Circuit found that when a company made a qualitative disclosure of certain information on one date and all that was necessary for the market to quantify the disclosure was certain mathematical calculations and estimates, "the efficient market hypothesis suggests that the market made these basic calculations [on that date]," 432 F.3d at 271, despite a mathematical computation of the effect of the disclosure months later in a newspaper and a price drop the day after the news article. In the present case, to be sure, the April 3 announcement is not months after the April 1 announcement, and the parties dispute whether there was sufficient information in the public domain to quantify the effect. However, the Government≢s last-minute shift in theory, announced simply as an "efficiency" measure, did not permit further analysis of to what extent the April 3 announcement is a redisclosure of the April 1 announcement. Dr. Wazzan's report sheds no light on which portion of the April 3, 2002 disclosure caused the observed stock price drop. He made no factual assumptions about the April 3 disclosures that would be necessary to determine if there is a "*Merck* issue" or not. Indeed, all that Dr. Wazzan is able to opine is that *something* in the April 3, 2002 disclosure is material.

27

**C.    The Government's last-minute theory: Defendant Schiff is criminally responsible for the effects of all disclosures on April 3, 2002.**

Perhaps the day before the *Daubert* hearing the Government recognized that it made little analytic sense to argue that the Government can admit stock price drop evidence to show materiality without demonstrating a causal link between the price drop and the charged conduct.[19]  After the *Daubert* hearing concluded and after the expert witnesses had been dismissed, the Government for the first time announced a new theory for the admission of Dr. Wazzan's testimony.  What was announced for "efficiency" at the outset of the hearing revealed itself to be a theory shift.  First, the Government discards the stock price drops following the April 1 and April 25 announcements because it cannot disaggregate the effect of the several news events.  Then, under the new theory, the Government "plan[s] to show through fact witnesses at trial that all three pieces of the announcement on April 3rd were related." (3/11/2008 Tr. at 165.)

The Government failed to provide proper notice that this factual premise was an underpinning for Dr. Wazzan's opinion before the *Daubert* hearing so that the proffered expert could be cross-examined on the facts underlying this theory under FRE 705.  Thus, the "fit" of the expert's testimony could not be tested at the *Daubert* hearing.  Second, the Government's plan to "show through fact witnesses at trial that all three pieces of the announcement on April 3rd were related" is a separate topic that is certainly not clear from the face of the April 3 press

---

[19] Nonetheless, the Government does continue to press this argument in its motion to exclude the testimony of Dr. Hubbard.  As discussed further below, the Government argues that it can introduce evidence of the stock price drop to *prove* materiality, but that if Defendant Schiff attempts to prove that the stock price drop is unrelated to his conduct, such testimony will be overly prejudicial because it might cause the jury to believe that if there is no stock price drop, there is no crime.  (*See* Dkt. 222 at 10.)  If the stock price drop is not related to Defendant Schiff's charged conduct, that might be evidence *against* materiality (i.e., the flip side of the Government's own argument for admissibility). The Government could certainly still adduce evidence in an effort to prove materiality other than with a stock price drop.

release and conference call, which clearly separated short term excess inventory work down from a long term drop in demand for certain drugs.  There is just no excuse for waiting until the eve of trial (and the end of the *Daubert* hearing) to launch a new theory (especially one that requires a new factual proffer).

          1.      <u>The Government failed to provide timely notice of its revised theory.</u>

The Government waited to announce the new legal theory for the admission of Dr. Wazzan's testimony until oral argument *after* the witness had been dismissed.  No notice of this theory was provided in the extensive briefing prior to the hearing,[20] nor did the Government attempt to provide a revised expert report, nor did the Government attempt to question Dr. Wazzan using either the assumed or hypothetical facts that the Government now asserts that it will prove through fact witnesses.  The Federal Rules of Criminal Procedure provide for notice of expert testimony.  Rule 16(a)(1)(G) mandates written notice of "any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence. ... The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  It is clear beyond peradventure that the Government's new theory has shifted away from the theory underpinning Dr. Wazzan's report, that analyzed the indisputably multiple unrelated adverse events announced on April 1

---

[20] Indeed, those Government briefs consistently argued the exact *opposite* of this new theory – arguing that unrelated events do not matter in proving materiality.

and April 25 exactly the same as April 3.[21]

The Government's new theory has never been briefed.  It was never factually proffered in all the pre-hearing briefs, nor before the hearing testimony.  The post-hearing submissions were ordered solely to permit the parties to annotate their prior arguments to the transcript of the testimony adduced at the *Daubert* hearing and to address the limited issue of whether there is a "*Merck* issue" based on the abandonment of stock price reaction to the April 1 disclosures as evidence of materiality.

To the extent that the Government seeks to raise new arguments, to make a new factual proffer, or to advance a new legal theory in the post-hearing submission, such portions are beyond the scope of the ordered briefing.  A post-hearing brief is not the place for new theories.  This is not arbitrary, but rather essential for a fair hearing process.  Defendant Schiff was entitled to notice of the facts that create the "fit" between Dr. Wazzan's testimony and the issues in this case, and the opportunity to cross-examine Dr. Wazzan regarding those underlying facts.[22]  If such notice had timely been given, Defendant Schiff would have had the opportunity to brief and argue and cross-examine on these issues.  He had not of these rights.  Moreover, the Court cannot fulfill its gatekeeping function in evaluating the proposed expert without knowledge before the *Daubert* hearing of the Government's theory for the admissibility of the testimony.

---

[21] For example, the April 1, 2002 10-K included information about BMS's decision to settle an antitrust dispute related to Bu-Spar for $32 million and to grant a royalty-free license to the patent for Bu-Spar.  There is absolutely nothing in this case to suggest that Defendant Schiff's charged conduct here relates to the antitrust litigation.  Thus, it is clear that the Government did not intend to argue that Dr. Wazzen's report should be admitted because fact witnesses would testify that all of the disclosures related to charged conduct.  The report makes no reference to such underlying fact assumptions, and the processes set forth in FRE 705 were never set in motion because of the lack of notice.  Moreover, if Dr. Wazzan used the same assumption of relatedness for April 1 and April 25 that the government now asserts underpins the April 3 analysis, such an assumption would highlight the inherent lack of fit and unreliability of the assumptions underlying Dr. Wazzan's testimony.

[22] Indeed, it appears from Dr. Wazzan's testimony at the *Daubert* hearing that he had no idea that his opinion was being limited to April 3, nor that there were any factual assumptions that made April 3 different from April 1 or April 25.

Many months and reams of paper have been devoted to the *Daubert* process, and it is a violation of the procedural rules set forth in the Federal Rules of Criminal Procedure, the FRE, and fundamental due process to toss out a new theory now.  The bare bones factual proffer is inadequate and not accepted as reliable under the ever-shifting theories of this case.[23]

> 2.      The underlying facts proffered likely require expert testimony.

On April 3, BMS separately announced a short term excess inventory workdown and a long term demand decrease for its pharmaceuticals as well as other announcements.  The April 3 disclosures, on their face, relate to long-term changes in demand and the "most rigorous demand-based prescription model." (Gov't Ex. 439 at 3.)  Separately, the announcement states a specific shorter period of time to work down excess inventory.  Thus, it is not facially apparent that all of the April 3 disclosures relate to the charged conduct about the use of sales incentives to create alleged excess wholesaler inventory to meet quarterly Wall Street targets.  Whether all, some, or none of the decrease in demand predicted by the company can be attributed to Defendant Schiff appears to be a complex question.

The Government has, over and over again, insisted that it need not establish the reason for the stock price drop.  To suddenly turn 180 degrees and reverse course, without notice, to state that the entirety of the April 3, 2002 disclosures are attributable to the misstatements charged in the indictment is a brand new, untested purported factual basis for admissibility of the expert's opinion.  Rule 16(a)(1)(G) required that factual basis to be stated in the summary of the expert opinion.  It was not.

---

[23] Moreover, the late factual proffer itself raises many questions about the "relatedness" of the April 3 disclosures to the charges in the indictment.

This argument serves to underline the importance of notice of the Government's theory of admissibility prior to the *Daubert* hearing.  Whether or not the facts of "relatedness" are the types of facts about which expert testimony is required is exactly the type of inquiry which should be examined as part of the *Daubert* process.  If notice had previously been given pursuant to Rule 16(a)(1)(G), then the Court could have ordered disclosure of the factual premise prior to cross-examination at the *Daubert* hearing pursuant to FRE 705.  None of that happened despite eight month's time within which to do it.  Rather, it appears that the Government theory of admissibility changed course dramatically the weekend before the *Daubert* hearing and was not even disclosed at the hearing itself until all the witnesses had stepped down and departed.  The Court and Defendant Schiff should have been provided with the opportunity to examine the bases for these purported facts and assumptions and to question Dr. Wazzan about them.  Therefore, the "theory shift" to April 3 alone and its factual premises have been advanced too late and with far too little to support a ruling at the 11th hour that permits Dr. Wazzan to testify beyond the areas outlined above.[24]

## IX.   R. Glenn Hubbard: Defendant's Proposed Expert - Materiality of Stock Price Drop.

Dr. R. Glenn Hubbard holds a Ph.D. in economics from Harvard University.  He is the Dean of the Columbia Graduate School of Business, and holds a professorship in Finance and Economics at the business school and is a professor of Economics in the Faculty of Arts and Sciences.  Dr. Hubbard is also a research associate at the National Bureau of Economic Research, a visiting scholar at the American Enterprise Institute, and an advisor to the President

---

[24] If, during the trial, the Government believes that it has adduced sufficient factual support for its argument that all of the disclosures on April 3, 2002 are attributable to Defendant Schiff's charged conduct, the Government may make an application at that time to admit stock price drop evidence related only to the April 3, 2002 disclosure. In such a factual setting, the Court and Defendant Schiff will have heard the factual evidence to determine if indeed there are not confounding factors that require an expert.

of the Federal Reserve Bank of New York.  From 2001 to 2003, he served as Chairman of the
President's Council of Economic Advisors.  During his career, he has also served as Chair of the
Economic Policy Committee for Organization for Economic Co-operation and Development
(OECD), Deputy Assistant Secretary of Treasury, and an economic advisor to various
government departments.

Dr. Hubbard issued one report in which he opines that: (1) BMS's stock price was not
inflated during the January 2000 through April 2002 period as a result of inadequate or
misleading disclosures by BMS with respect to the nature and extent of wholesaler inventories
and/or use of sales incentives to wholesalers; (2) analysts did not alter their expectations
regarding BMS's future earnings based on disclosures about the inventory build-up even though
analysts appear to have revised forecasts for other drug manufacturers who reported earnings
surprises during the same period; (3) Defendant Schiff did not profit from his ownership of BMS
stock during the relevant time period; and (4) Dr. Wazzan's event study does not provide a basis
to determine whether the announcements related to wholesaler inventories *caused* BMS's stock
price to decline at all and the magnitude of the observed stock price decline in April 2002
identified by Dr. Wazzan is consistent with BMS's disclosures of a reduction in EPS from lower
expected future demand for BMS drugs.

The Government moved to exclude the proffered testimony because: (1) the cause of
BMS's stock decline is not at issue; (2) Dr. Hubbard's opinion assumes Defendant Schiff's
innocence; (3) no reliable methodology supports Dr. Hubbard's parsing of BMS's disclosures
concerning wholesaler excess inventory; and (4) the proposed testimony will confuse and
mislead the jury.  (*See* Dkt. 190).[25]

---

[25]  In its supplemental submission, the Government also asserts that "[t]he Government and Defendant
Schiff have executed a stipulation concerning the Defendant's earnings and compensation during 2000 and 2001 that

In its supplemental submission, the Government asserts that admission of Dr. Hubbard's testimony will be overly prejudicial.  Specifically, the Government argues:

> if Dr. Hubbard is permitted to opine that Defendant Schiff's misrepresentations and omissions did not cause a decline in BMS's stock, there is every reason to believe the jury may be misled into concluding that no crime was committed, despite the unquestioned position of Congress, the Supreme Court and the Third Circuit that the Government need not prove market loss in a criminal securities fraud case. To allow Dr. Hubbard to offer his proposed testimony is to invite the jury to essentially disregard this Court's instructions on the elements of the offense, and reach a verdict based solely on the directive of a purported expert. Such a result is far outside the boundaries of Rule 702, and must be precluded.

(Dkt. 222 at 10.)

This argument turns on its head the purpose of stock price drop evidence and demonstrates the fundamental misunderstanding of the relevance of stock price drop evidence that permeates the Government's briefing.  If the Government wishes to argue to the jury that the jury can infer materiality from a stock price drop, the Government implicitly invites the jury to speculate that the cause of the stock price drop is the charged conduct.  Indeed, that is what Paragraph 46 of the revised Indictment invites the jury to do when it alleges that Defendant Schiff's alleged fraud "*caused* BMS shareholders to sustain hundreds of millions of dollars in losses after the nature and extent of BMS's channel stuffing and buildup of excess inventory was disclosed to the public beginning on or about April 1, 2002."  (Emphasis added.)  If anything, such speculation will be overly prejudicial to the defendant without evidence of the causal connection, not the reverse.

---

obviates Dr. Hubbard's proposed testimony on this issue." (Dkt. 222 at n.3.)  To the extent that the parties have executed such a stipulation, the Court expects that Dr. Hubbard will not be questioned about this portion of his proffered testimony.  If Defendant Schiff prefers to admit this testimony through Dr. Hubbard rather than through a stipulation, the Court will not preclude Defendant from so doing.

The Government also argues that there is no reliable method underlying Dr. Hubbard's disaggregation of different disclosures in the April 3 announcement.  This argument ignores the fact that BMS itself provided a disaggregated estimate for separate pieces of information: the April 3, 2002 announcement provided an estimate for the effect on EPS of inventory workdown and a separate estimate for the effect on EPS of a reduction in long-term demand.  Dr. Hubbard demonstrates using economic analysis that these separately quantified disclosures can be analyzed separately.[26]  This testimony meets the *Daubert* criteria and is admissible.

Finally, the Government objects that Dr. Hubbard's testimony improperly provides expert testimony as to Defendant Schiff's state of mind.  Dr. Hubbard opines that Defendant Schiff stated that wholesaler inventory increased by "'a couple of weeks' in October 2001 and then an additional increase of 'one to two weeks' in January 2002, or a total of between three and four weeks of additional wholesaler inventory outstanding at the end of 2001."  (Hubbard Report, Dkt. 221-10 at ¶ 38.)  To the extent that Dr. Hubbard seeks to offer an opinion related to Defendant Schiff's mental intent when making these disclosures, such testimony is inadmissible under FRE 704.  To the extent that Dr. Hubbard merely reads the disclosures as part of a public statement as a means of determining what statements were publicly available, such testimony is admissible.[27]

---

[26] Expert testimony may "assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context."  4 Jack B. Weinstein & Margaret A. Berger, *Weinstein≡s Federal Evidence* ' 702.03[1] (2d ed. 2006) (footnote omitted).  Thus, to the extent that Dr. Hubbard's testimony explains and analyzes the economic implications of BMS's announcement, this testimony is appropriate and relevant expert testimony.

[27] To the extent that Mr. Porten engages in an interpretation of Defendant Schiff's mental intent when Defendant made disclosures, it is similarly inadmissible for Mr. Porten to opine on Defendant Schiff's state of mind or his intent.  Nonetheless, Mr. Porten is also permitted to testify as to what a reasonable investor would have understood from the statements made and what analysis would have been performed by a reasonable investor on the basis of those public disclosures.

X.      **Charles Porten: Defendant's Proposed Expert - Investor Information and Analysis.**

Charles Porten holds an M.B.A. in finance from Harvard University and is currently the President of CZP Associates, Inc.  He has worked for a broker-dealer, a registered investment advisor and bank trust departments, and has had responsibility for assets of over $20 billion. Mr. Porten has been a Chartered Financial Analyst since 1977.  He has worked as both an analyst and an investor, and has been qualified to testify as an expert in various prior cases and arbitrations. Mr. Porten issued one report in which he offers the following opinions: 1) when making decisions to invest in pharmaceutical companies, investors are focused on factors that drive long-term earnings potential; 2) investors were aware of the levels of wholesaler inventory of BMS products and sales incentives offered by BMS to wholesalers; and 3) investors did not value BMS's forecasted earnings at a premium relative to other pharmaceutical companies during the period January 2000 to April 2002.

The Government moved to exclude the proposed testimony of Charles Porten because: 1) he does not have enough experience analyzing or investing in the pharmaceutical industry, 2) his "factual summaries" are not appropriate expert testimony, and 3) he fails to describe the methodology used to reach a conclusion about what investors could have known about excess inventory at the end of 2001.  The Government's first objection appears to be a challenge to Mr. Porten's qualifications.  As noted above, the parties agreed prior to the *Daubert* hearing that they were not bringing such challenges.  Moreover, Mr. Porten is presented as an expert on what information is important to a reasonable investor.  He has experience in investing client assets and valuing companies, including pharmaceutical companies.

Mr. Porten testified at the hearing that he cites to analyst reports for corroborating evidence of his opinions regarding what information is important to investors.  Moreover, even if Mr. Porten

36

is offered to summarize the information available from analyst reports, such testimony may still

be useful to the jury.  *See Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999)

(admitting an expert's testimony regarding his review and summary of the defendant's financial

analysis).

Because Mr. Porten is testifying under FRE 702 from his specialized knowledge and long

experience as an investor, his methodology is not subjected to the same examination as a more

scientific or technical expert's would be.  The Court finds that Mr. Porten's opinions regarding

what information is important to investors is at the heart of the dispute about materiality at issue

in this case and are thus relevant.[28]

## XI.    Adam Fein: Defendant's Proposed Expert - Channel Distribution and Pharmaceutical Industry.

Dr. Fein holds a Ph.D. from the Wharton School of Business at the University of

Pennsylvania in managerial science and applied economics.  Dr. Fein is the founder and

president of Pembroke Consulting, Inc.  As part of his consulting practice, he consults with

manufacturers (including pharmaceutical companies) on distribution channel strategy,

marketing.  Dr. Fein has served as an expert witness and legal consultant on cases involving

supply chain and distribution channels.  Dr. Fein also testified that a significant portion of his

doctoral dissertation was devoted to analyzing the history and evolution of the pharmaceutical

distribution industry.  Dr. Fein submitted one report in which he offers the following opinions: 1)

the Superseding Indictment reflects certain misunderstandings about the distribution of

---

[28] The Court provided the parties with the opportunity to provide any transcript references to support their motions to exclude proffered experts.  In its submission, the Government provided no references related to Mr. Porten.  (*See* Dkt. 222 at n.2 ("The Government's arguments concerning the exclusion or limitation of the proposed testimony of Mr. Charles Porten are addressed fully in the Government's February 27, 2008 Omnibus Memorandum and are therefore not repeated here.").)  The Court reads this to indicate that none of Mr. Porten's testimony further supports the arguments in the Government's brief.

pharmaceutical products and the nature of the relationship that manufacturers have with wholesalers; 2) BMS's use of sales incentives with wholesalers was consistent with common business practice in the pharmaceutical industry during the period from January 2000 to April 2002; and 3) information about the nature and extent of wholesaler inventories of BMS's products was similarly available to the public and BMS during the period from January 2000 to April 2002.

The Government challenges Dr. Fein's testimony because "the Government's use of particular sentences or phrases in the Superseding Indictment will not be an issue for the jury." (Dkt. 190 at 16.)  This argument fundamentally misunderstands the basis of Dr. Fein's testimony on these issues.  In particular, Dr. Fein is offered to provide the jury with information related to the complex distribution system employed by manufacturers, wholesalers, and retail sellers to provide pharmaceutical products to customers.  While Dr. Fein's report analyzes the Government's theory based on the indictment, his testimony at trial will be to correct the theories that the Government presents at trial.  The indictment serves to provide notice to the defense of the nature of the evidence that he will have to refute at trial.

Moreover, courts routinely admit testimony from industry experts related to the business practices in those industries.  *See, e.g., United States v. Leo*, 941 F.2d 181 (3d Cir. 1991) (affirming the admission of a Governmental contracting expert's testimony regarding industry customs and practices in the field of defense contracting).

The Government also argues that Dr. Fein demonstrated at the *Daubert* hearing that he does not have the expertise necessary to opine on what analysts subjectively knew or did not know.  To the extent that Dr. Fein attempts to offer such an opinion, it will not be permitted.  Nonetheless, Dr. Fein may refer to analyst reports to support his explanation regarding the

38

industry practices and to show public information that was objectively available to analysts to use.  Thus, Dr. Fein may not opine as to what analysts actually knew, but he may rely upon analyst reports as part of the information upon which his testimony is based.  For example, Dr. Fein opines that information about wholesaler inventory levels was available to the public.  To the extent that this opinion is based on Dr. Fein's knowledge of business practices within the industry, this testimony is permissible.

Dr. Fein's testimony will be helpful to the jury in understanding the sales practices at issue in this case and how those practices fit into the custom and practice of the pharmaceutical industry.  Therefore, the Court finds that Dr. Fein's testimony is admissible.

Therefore, **IT IS**, on this 19th day of March, 2008, hereby

**ORDERED** that Defendant Schiff's motion *in limine* to exclude certain arguments and evidence concerning Mr. Schiff's purported omission liability [Dkt. 155] is **GRANTED IN PART** and **DENIED IN PART** consistent with the reasoning above; and it is

**ORDERED** that Defendant Schiff's motion to dismiss the charges of violations of Section 10(b) in any BMS SEC filings [Dkt. 164] is **GRANTED** as set forth in the above opinion, and Defendant Schiff's motion to dismiss the charges of violations of Rule 10b-5(a) and (c) is **DENIED**;[29] and it is

**ORDERED** that Defendant Schiff's motion to exclude the testimony of C. Paul Wazzen [Dkt. 180, 221] is **GRANTED IN PART** and **DENIED IN PART**[30] for the reasons given above;

---

[29] Count Two will still proceed to trial on alleged misstatements and omissions on analyst calls, aiding and abetting such misstatements, liability under Rule 10b-5(a) and (c) for a fraudulent scheme or business practice, and aiding and abetting such (a) and (c) violations.  Count One will still proceed to trial on an alleged conspiracy to violate Section 10(b)-5 consistent with the theories remaining in Count Two.

[30] In a letter from George Leone, the Government requests a ruling regarding whether evidence of the stock price drop as evidence of materiality is admissible without an expert.  (*See* Dkt. 223.)  In the original motion *in*

and it is

       **ORDERED** that the Government's omnibus motion to exclude proposed defense expert

testimony [Dkt. 190, 222] is **DENIED** for the reasons given above; and it is

       **ORDERED** that Defendant Schiff's motion to strike the Government's supplemental

submissions related to the admissibility of experts [Dkt. 222, 223] is **GRANTED IN PART** and

**DENIED IN PART** for the reasons given above.

.

                        **/s/ Faith S. Hochberg**         
                        Hon. Faith S. Hochberg, U.S.D.J.

---

*limine*, the Court was presented with the question of the admissibility of the stock price drops on April 1, April 3, April 25, and July 23. The Court was concerned that the multiple disclosures in this case made this case substantially different from cases where stock price drop evidence was admitted without expert testimony. For that reason, the Court ruled that, absent caselaw that was not timely briefed, an expert would be necessary to prevent the jury from improperly speculating about materiality when presented with evidence of a stock price drop that might not be related to Defendant's conduct. The Court has never required that the Government or the Government's expert prove any specific loss to any particular victim.

     To the extent that the Government is now making a new motion, along with an additional factual proffer, such motion is untimely and the factual proffer is made too late for a response by Defendant. Moreover, to the extent the letter from Mr. Leone attempts to provide a new factual proffer such as that the "evidence will show that the announcement's information was related to the fraud and presented new information about the fraud, and was so viewed by BMS and the investing community" (Dkt. 223 at 4), such proffers should have been presented prior to the *Daubert* hearing. Mr. Leone's letter contains representations that are belied by the Government's position repeatedly professed during the history of the litigation, which Mr. Leone may not have been involved in and may understandably have incomplete information about.

     The Court ordered the parties to provide supplemental submissions after the *Daubert* hearing for the limited purpose of connecting transcript references to the arguments made in the prior briefs and to address any *Merck* issues raised by the limitation of the evidence to the April 3, 2002 announcement. To the extent the responses follow this order, the Court has considered them. To the extent that the Government's supplemental submissions related to the *Daubert* motions (Dkt. 222, 223) contain arguments and factual proffers outside the scope of the Court's order, those portions are **STRICKEN**.

     The Court cannot make a ruling on the new and narrower question presented in the Government's new theory without hearing the evidence adduced at trial because the Court cannot evaluate in advance the accuracy of the Government's proffered facts. For that reason, the Court reserves judgment as to whether an expert would be necessary to disentangle the multiple disclosures related to the April 3 announcement or whether such evidence has been sufficiently presented through fact witnesses. If during the course of the trial, the Government believes that it has laid a factual foundation for admission of the stock price drop evidence related to the April 3, 2002 announcement by showing that all of the disclosures relate to the *conduct charged in the indictment*, the Court will entertain a new motion to admit the evidence at that time.